The INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, AFL–CIO, and Dale Hartford, Plaintiffs,

v.

WINSHIP GREEN NURSING CENTER, Hillhaven Corporation, and First Healthcare Corporation, Defendants.

Civil No. 95–12–P–C.

United States District Court, D. Maine.

Feb. 12, 1996.

---

Jeffrey Neil Young, McTeague, Higbee, Libner, MaCadam, Case & Watson, Topsham, Maine, Mark Schneider, IAM International, Upper Marlboro, MD, for Plaintiffs.

Peter L. Murray, Richard L. O'Meara, Charles P. Piacentini, Jr., Murray, Plumb & Murray, Portland, Maine, David J. Kerman, Jackson, Lewis, Schnitzler & Krupman, Boston, MA, for Defendants.

## MEMORANDUM AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

GENE CARTER, Chief Judge.

Plaintiffs, International Association of Machinists and Aerospace Workers, AFL–CIO, ("IAM") and IAM employee Dale Hartford, sue Defendants, Winship Green Nursing Center, Hillhaven Corporation, and First Healthcare Corporation, for six alleged civil violations arising out of Defendants' unauthorized use of IAM's registered service mark during IAM's campaign to organize certain Winship Green employees. Plaintiff's seek relief under: the Lanham Act, 15 U.S.C. § 1051, *et seq.*, for trademark infringement, § 1114(1) (Count I), and unfair competition, § 1125(a) (Count II); Maine statutory law prohibiting deceptive trade practices, 10 M.R.S.A. §§ 1211–1216 (Count III), and trademark dilution, 10 M.R.S.A. § 1530 (Count V); and Maine common law of defamation (Count IV) and invasion of privacy (Count VI). First Amended Complaint and Demand for Jury Trial (Docket No. 10)

**653**

("Complaint"). Now before this Court is Defendants' Motion for Summary Judgment (Docket No. 23). For the reasons stated below, this Court will grant that motion as to the federal claims in Counts I and II, and will decline to exercise supplemental jurisdiction over the remaining, pendent state claims in Counts III, IV, V, and VI.

## I. FACTS

The parties do not dispute those material facts that prove dispositive of this case. From May to August of 1994, the IAM conducted a campaign to organize the nonprofessional employees of First Healthcare at the Winship Green Nursing Center. Motion for Summary Judgment ¶ 4. Plaintiff Dale Hartford was the Grand Lodge Representative and Organizer for IAM's Winship Green campaign. Complaint ¶ 10. During the campaign, management distributed written literature to Winship Green employees urging them to vote "no" on union representation. Motion for Summary Judgment ¶ 6. In late July or early August of 1994, management distributed the two pieces of literature that generate this legal controversy. Motion for Summary Judgment ¶ 7–9; Plaintiffs' Opposition to Defendants' Motion for Summary Judgment ¶ 8 (Docket No. 30).

The first was a letter on IAM letterhead, bearing the IAM service mark and an unauthentic signature of Dale Hartford. *See, e.g.,* Complaint Ex. C. Each letter was addressed individually to a potential member of the bargaining unit that the IAM sought to represent and informed the addressee that IAM was notifying Winship Green of its obligation, pursuant to the collective bargaining agreement, to terminate the addressee for failure to pay union dues and fees. *Id.* Each letter was postdated August 5, 1995, one year and one day after the upcoming election. *Id.*

The second document, also on IAM letterhead including the IAM mark, was entitled "PAYABLE TO MACHINISTS UNION BY [each individually named addressee]," and

listed monetary amounts associated with union dues, initiation fees, and fines. Complaint Ex. F. The message "WITHOUT THE MACHINISTS UNION, DO NOT PAY THIS BILL" appeared in large type at the bottom of the document. *Id.*

## II. DISCUSSION

### A. FEDERAL TRADEMARK CLAIMS

It is necessary at the outset to decide the legal issues regarding the applicability of trademark laws to the unauthorized use of a mark outside of a commercial context.[1] This Court takes the case of *L.L. Bean, Inc. v. Drake Publishers, Inc.,* 811 F.2d 26 (1st Cir.), *cert. denied,* 483 U.S. 1013, 107 S.Ct. 3254, 97 L.Ed.2d 753 (1987), to be its primary source of guidance for deciding these issues. There, the Court of Appeals for the First Circuit instructed at length on (1) the scope of the property right originating in trademark laws and asserted by a trademark holder, and (2) the scope of the constitutional right originating in the First Amendment and asserted by an unauthorized user of the trademark.

In describing the contours of the mark holder's intellectual property right, the *L.L. Bean* court quoted widely approved language from the Second Circuit to emphasize the distinctive character of that right:

"*[T]rademark is not property in the ordinary sense* but only a word or symbol indicating the origin of a *commercial* product. The owner of the mark acquires the right to prevent the goods [or services] to which the mark is applied from being confused with those [goods or services] of others and to prevent his own trade from being diverted to competitors through their use of misleading marks."

*L.L. Bean,* 811 F.2d at 29 (second emphasis added) (quoting *Power Test Petroleum Distributors v. Calcu Gas,* 754 F.2d 91, 97 (2d Cir.1985)). The mark holder's right, then, "extends only to injurious, unauthorized *commercial uses* of the mark by another."[2] *L.L.*

---

1. This Court does not reach the remaining legal or factual issues raised by Defendants' Motion for Summary Judgment against Plaintiffs' federal claims.

2. In describing trademark rights as limited in their application to "commercial" uses of a mark, the *L.L. Bean* court appears to refer to two similar, but meaningfully distinct, limitations.

*Bean,* 811 F.2d at 29 (citing *Lucasfilm Ltd. v. High Frontier,* 622 F.Supp. 931, 933–35 (D.D.C.1985)). This limitation on the positive grant of a trademark right is embodied in the language of both federal statutory provisions at issue in this case.[3] *See* 15 U.S.C. §§ 1114(1)(a) ("Any person who shall ... use in commerce ... in connection with the sale, offering for sale, distribution or advertising of any goods or services"), 1125(a) ("Any person who shall ... use [a false designation of origin] in connection with any goods or services ... and shall cause such goods or services to enter into commerce").[4] These federal laws, then, do not even reach an unauthorized use unless it is "in connection with any goods or services."

 The *L.L. Bean* court also instructs that an unauthorized trademark user's con-stitutional protection from the enforcement of trademark laws hinges on whether the user's speech is "commercial" or "communicative." Speech is "commercial" when it is "'related solely to the economic interests of the speaker and its audience.'" *L.L. Bean,* 811 F.2d at 32 (quoting *Central Hudson Gas & Elec. v. Public Serv. Comm'n,* 447 U.S. 557, 561, 100 S.Ct. 2343, 2349, 65 L.Ed.2d 341 (1980)). When trademark laws are applied to commercial speech uses of a mark, their legitimate purposes typically meet the requirements of the relatively weak First Amendment protection afforded such speech.[5] *L.L. Bean,* 811 F.2d at 31, 32. Speech is "non-commercial" or "communicative" when its purpose is "editorial or artistic," "communicating ideas or expressing points of view," or "to convey a message."

First, the very definitions of trademark rights limit their application to "commercial" uses of a mark, to uses "in connection with any goods or services." *See L.L. Bean,* 811 F.2d at 29; 15 U.S.C. §§ 1114(1), 1125(a). Second, the First Amendment limits the application of trademark rights predominantly to uses of a mark that constitute "commercial speech": although it readily tolerates their application to "commercial speech," it does not so readily tolerate their application to "noncommercial" or "communicative speech." *See L.L. Bean,* 811 F.2d at 32 & n. 4.

Certainly "commercial" appropriately describes both limitations because they track each other so closely; indeed, it seems fair to infer that the statutory language limiting the application of these rights to uses "in connection with any goods or services" serves the purpose of keeping most applications of these rights within the realm of "commercial speech." On the other hand, the limitations diverge enough that it is possible for the unauthorized use of a mark to be, at once, "commercial" in the statutory sense and "noncommercial" in the constitutional sense. *See, e.g., id.* at 32 n. 4 (noting the possibility of "unauthorized uses of trademarks on products [statutorily 'commercial'] whose principal purpose is to convey a message [constitutionally 'noncommercial'].")

To avoid confusion between the two possible meanings of "commercial," however, this Court will hereinafter use "commercial" to describe only the constitutional limitation and will use "in connection with any goods or services" to describe the statutory limitation.

3. Although the *L.L. Bean* court's discussion of the distinctive character of trademark rights also relates to the two state trademark laws involved in this case, this Court will limit its discussion to Plaintiffs' federal claims because pendent juris-diction over those state law claims will not be exercised.

4. Although the *L.L. Bean* court does not explicitly base its understanding of a mark holder's peculiar property rights on the language of these two statutes, this Court considers it appropriate, for three reasons, to read the opinion as implicitly based thereon. First, the *L.L. Bean* court sought to articulate the proper understanding of trademark rights in general, even though that general understanding was applied later in that opinion only to the Maine anti-dilution statute in particular. Second, the cases from which the *L.L. Bean* court derives its general understanding of the shape of trademark rights, *Power Test* and *Lucasfilm Ltd.,* involved the interpretation of federal trademark provisions that are either the same or similar to those applicable in this case. *See Power Test,* 754 F.2d at 94 (discussing Lanham Act infringement and false designations of origin); *Lucasfilm Ltd.,* 622 F.Supp. at 934 (discussing §§ 1114, 1125(a)). Third, the federal statutory provisions prohibiting *both* infringement *and* unfair competition contain the "in connection with any goods or services" language that embodies the understanding of trademark rights articulated by the *L.L. Bean* court. Although an action for unfair competition is broader in scope than an infringement action in some respects, it is not broader in the respect relevant to this case, *i.e.,* such an action still cannot reach a false designation without a connection to any goods or services. This remains true even though Defendants have insisted on the "in connection with any goods or services" limitation in the infringement context only.

5. This includes, for example, commercial parody, "parody which engenders *consumer* confusion." *L.L. Bean,* 811 F.2d at 32 n. 3 (emphasis added).

*Id.* at 29, 32 & n. 4. When trademark laws are applied to noncommercial, communicative speech uses of a mark, a balancing test should be applied to determine whether or not they meet the requirements of the relatively strong First Amendment protection afforded such speech. *Id.* at 32 n. 4 (indicating propriety of balancing test for "products whose principal purpose is to convey a message").

■ In light of this framework, the four distinct positions advanced by the parties to this case may be characterized as follows: (1) Plaintiffs argue primarily that their trademark claims fall within the scope of the trademark laws and beyond the scope of substantial First Amendment protection, so that those claims may go forward. (2) Plaintiffs argue, in the alternative, that their trademark claims fall within the scope of both the trademark laws and substantial First Amendment protection, and that those claims survive the balancing test. (3) Defendants argue primarily that Plaintiffs' claims fall beyond the scope of the trademark laws, so that those claims fail regardless of the constitutional status of Defendants' speech. (4) Defendants argue, in the alternative, that Plaintiffs' claims fall within the scope of both the trademark laws and substantial First Amendment protection, but that those claims fail the balancing test. This Court agrees with Defendants' primary contention, that Plaintiffs' claims fail because they fall beyond the scope of trademark laws, rendering unnecessary to the determination of this case the constitutional status of Defendants' speech.[6]

Plaintiffs' claims fall outside the coverage of the two federal trademark statutes here at issue because Defendants did not use the IAM mark "in connection with any goods or services." Plaintiffs argue that Defendants used the IAM mark "in connection with" *Plaintiffs'* "services," namely, "the representation of workers," since Defendants' letter constitutes a kind of false advertisement impeding Plaintiffs' "sale" or "offering for sale" of those "services."[7] This Court rejects Plaintiffs' argument for two reasons.

First, neither Defendants nor Plaintiffs are competing for the "sale" to a consumer of their respective "services." Instead, Defendants and Plaintiffs are competing for the vote from an employee, for assent to, support of, and participation in their respective visions of the proper ordering of the workplace. The fact that some money is required to realize the union's particular vision does not suffice to render the realization of that vision a commercial "service" for trademark purposes.

Second, Plaintiffs misread "*any* goods or services" to include the *holder's* as well as the *infringer's* "goods or services." All registered marks are, by definition, "in connection with" the mark holder's "goods or services." All unauthorized uses of such marks, in turn, inherently bear that same connection. On Plaintiffs' reading, then, all unauthorized uses would be "in connection with [a holder's] goods or services," and no unauthorized use would ever be excluded by operation of this language. This interpretation not only effectively reads the language out of the

---

6. Without directly reviewing this Court's decision regarding the scope of Maine's anti-dilution statute, the *L.L. Bean* court nevertheless appears to have indirectly rejected plaintiff's anti-dilution claim both for failure to fall within the scope of that statute and for failure to pass constitutional muster. *L.L. Bean,* 811 F.2d at 32 (finding both that defendant's use was not "commercial," and that defendant's use was "editorial or artistic" speech). Upon determining that present Plaintiffs' claims do not fall within the scope of the federal trademark statutes, however, this Court will decline to reach the constitutional question. *See id.* at 35 (Campbell, C.J., dissenting) (citing *Ashwander v. Tennessee Valley Authority,* 297 U.S. 288, 347, 56 S.Ct. 466, ——, 80 L.Ed. 688 (1936)).

7. It is not surprising that Plaintiffs characterize Defendants' quasi-advertisement letter as impeding *Plaintiffs'* "services" rather than promoting *Defendants'* "services." Defining Defendants' "services" in this context would be difficult indeed: if Plaintiffs provide the "services" of "the representation of workers," then Defendants' corresponding, competing "services" must be "avoiding the representation of workers" or "providing employees with a union-free workplace." Advancing such a facially implausible reading of "services" would not only strain credibility, but would undermine the facially plausible reading of "services" that Plaintiffs have advanced by rendering explicit its implausible implication.

statute, it ignores the critical function of this language, discussed above, to help delineate the scope of trademark property rights so that conflicts with the First Amendment are minimized. *See supra* note 2.

Therefore, because Plaintiffs' Lanham Act rights in their service mark do not extend to the injuries they claim to have suffered in this case, this Court will dismiss both of Plaintiffs' federal claims.

### B. PENDENT STATE CLAIMS

Because this Court will dismiss all claims over which it has original jurisdiction, it will decline to exercise supplemental jurisdiction over Plaintiffs' four remaining state law claims. 28 U.S.C. § 1367(c)(3).

### III. CONCLUSION

Accordingly, it is *ORDERED* that Defendants' Motion for Summary Judgment be, and it is hereby, *GRANTED* as to Counts I and II. It is further *ORDERED* that Counts III, IV, V, and VI be, and they are hereby, *DISMISSED*.