The **INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, AFL–CIO, et al., Plaintiffs, Appellants,**

v.

**WINSHIP GREEN NURSING CENTER, et al., Defendants, Appellees.**

No. 96–1206.

United States Court of Appeals, First Circuit.

Heard July 30, 1996.

Decided Dec. 30, 1996.

Mark Schneider, with whom John M. West and Bredhoff & Kaiser, P.L.L.C., Washington, DC, were on brief, for appellants.

Richard L. O'Meara, with whom Charles P. Piacentini, Jr. and Murray, Plumb & Murray, Portland, ME, were on brief, for appellees.

Before SELYA, Circuit Judge, TORRES * and SARIS, ** District Judges.

SELYA, Circuit Judge.

In this eccentric case, the International Association of Machinists and Aerospace Workers (IAM or Union) charged an employer, Winship Green Nursing Center (Winship), with violating the Lanham Act, 15 U.S.C. §§ 1051–1127 (1994), through its unauthorized use of a service mark on propaganda disseminated during a union organizing campaign.[1] The district court granted Winship's motion for *brevis* disposition, reasoning that the Union's claim failed to satisfy the Lanham Act's jurisdictional requirements because (1) the parties were not competing for the sale of commercial services, and (2) Winship's admittedly unauthorized use of the mark was in connection with services offered by the markholder rather than services of-

---

fered by the infringer. *See International Ass'n of Machinists v. Winship Green Nursing Ctr.*, 914 F.Supp. 651, 655–56 (D.Me. 1996). The Union appeals. We affirm, albeit on a different ground.

## I. BACKGROUND

We present the basic facts in the light most flattering to the party vanquished by summary judgment. All the relevant events occurred in 1994, and all dates refer to that year.

### A

In May the Union mounted a campaign to organize the nonprofessional employees at Winship's facility in Bath, Maine. Not surprisingly, management resisted this initiative and exhorted the affected employees to vote against IAM's election as a collective bargaining representative. As part of its retort Winship hand-delivered two pieces of campaign literature to employees in the putative bargaining unit. These handouts form the basis for IAM's lawsuit.

1. *The First Flier.* In July Winship distributed a three-page flier, the first page of which asks rhetorically:

WHAT WOULD YOU DO IF YOU GOT THE ATTACHED LETTERS?

WOULD YOU BE ABLE TO FIND ANOTHER JOB?

HOW WOULD YOU PAY YOUR BILLS?

WOULD YOU WISH THAT THE MACHINISTS UNION HAD NEVER GOTTEN IN AT WINSHIP GREEN?

The flier then advises recipients that "IT'S NOT TOO LATE" and implores them to "GIVE [certain named managers] A CHANCE" by "VOT[ING] NO ON AUGUST 4." The letters, addressed individually to particular employees and dated one year *after* the scheduled election, comprise the second and third pages of the flier. One letter purports to be written on the Union's

---

* Of the District of Rhode Island, sitting by designation.

** Of the District of Massachusetts, sitting by designation.

1. An IAM official, Dale Hartford, is also a plaintiff, and two affiliates of Winship (Hillhaven Corp. and First Healthcare Corp.) are codefendants. Since the presence of these additional parties does not affect the issues on appeal, we treat the litigation as if it involved only the Union (as plaintiff-appellant) and Winship (as defendant-appellee).

letterhead, complete with a reproduction of the IAM service mark (consisting of a set of machinist's tools surrounded by a gear and the IAM name)[2] and the facsimile signature of an IAM plenipotentiary, Dale Hartford. This missive suggests that the Union had notified Winship of its obligation, pursuant to an invented collective bargaining agreement, to terminate the recipient's employment because of her failure to pay certain assessments (e.g., union dues and an initiation fee). The other epistle, signed by Winship's director of operations, is also postdated. It acknowledges Winship's receipt of the notice and professes to inform the addressee that the company must honor the Union's request.

**2. *The Second Flier.*** The remaining piece of campaign literature, disseminated by Winship a few days before the election, urges the reader to vote against unionization and warns that union membership will bring significant financial burdens. This flier contains a simulated invoice inscribed on what purports to be IAM's letterhead (and which bears the IAM service mark). Under a heading that reads "PAYABLE TO THE MACHINISTS UNION BY [employee's name]", the invoice lists amounts designated as union dues, an initiation fee, and fines.[3] Commentary, undiluted by subtlety, accompanies this listing: "NO MATTER WHAT THE UNION HAS TOLD YOU—JUST ASK THE EMPLOYEES AT LOURDES HOSPITAL" AND "JUST ASK THE 13 EMPLOYEES AT GENERAL ELECTRIC IN SOUTH PORTLAND WHO WERE FINED FOR CROSSING THE PICKET LINE THERE." Large, bold letters at the bottom of the invoice proclaim: "WITHOUT THE MACHINISTS UNION, DO NOT PAY THIS BILL."

Notwithstanding Winship's tactics—or, perhaps, due to them—the employees chose IAM as their collective bargaining representative in the August 4 election.

**B**

The Union proved to be a sore winner. It soon filed suit against Winship alleging *inter alia* trademark infringement and unfair competition under the Lanham Act.[4] The Union premised its federal claims on the theory that Winship's unauthorized use of the registered service mark occurred "in connection with ... services," namely, IAM's representational services, and thereby transgressed sections 32(1) and 43(a) of the Lanham Act. *See* 15 U.S.C. §§ 1114(1)(a) & 1125(a) (quoted *infra* note 5). The district court rejected this theory for the reasons previously mentioned. *See IAM,* 914 F.Supp. at 655–56. This appeal followed.

**II. THE SUMMARY JUDGMENT STANDARD**

Though the case is unconventional, the generic legal standard that we must apply is prosaic. Summary judgment is appropriate in trademark infringement cases, as elsewhere, "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Boston Athletic Ass'n v. Sullivan,* 867 F.2d 22, 24 (1st Cir.1989) (quoting Fed.R.Civ.P. 56(c)). Generally speaking, a fact is "material" if it

---

**2.** Service marks and trademarks function to identify the source of services and goods, respectively. The difference between the two types of marks is not relevant here, and thus we will apply case law involving either form. *See Star Fin. Servs., Inc. v. AASTAR Mortgage Corp.,* 89 F.3d 5, 8 n. 1 (1st Cir.1996); *Volkswagenwerk Aktiengesellschaft v. Wheeler,* 814 F.2d 812, 815 n. 1 (1st Cir.1987).

**3.** The stated amounts are not only apocryphal but also extravagant. During the organizing drive, IAM repeatedly declared that there would be no initiation fee and that no worker's monthly dues would exceed $20.

**4.** IAM's complaint also embodied a salmagundi of pendent statelaw claims. The district court dismissed these claims without prejudice coincident with the entry of summary judgment on the federal claims. *See IAM,* 914 F.Supp. at 656. We understand that the Union is pursuing these claims in a separate state court action. Finally, the complaint sought injunctive relief under the Norris–LaGuardia Act, 29 U.S.C. §§ 101–115 (1994), but the Union now concedes the infirmity of this request.

potentially affects the outcome of the suit, *see Garside v. Osco Drug, Inc.,* 895 F.2d 46, 48 (1st Cir.1990), and a dispute over it is "genuine" if the parties' positions on the issue are supported by conflicting evidence, *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). While an inquiring court is constrained to examine the record in the light most favorable to the summary judgment opponent and to resolve all reasonable inferences in that party's favor, *see Hachikian v. FDIC,* 96 F.3d 502, 504 (1st Cir.1996), defeating a properly documented motion for summary judgment requires more than the jingoistic brandishing of a cardboard sword. This is especially true in respect to claims or issues on which the nonmovant bears the burden of proof; in such circumstances she "must reliably demonstrate that specific facts sufficient to create an authentic dispute exist." *Garside,* 895 F.2d at 48; *see also Anderson,* 477 U.S. at 256, 106 S.Ct. at 2514.

■ We review de novo the district court's grant of summary judgment. *See Mack v. Great Atl. & Pac. Tea Co.,* 871 F.2d 179, 181 (1st Cir.1989). Moreover, an appellate tribunal is not bound by the lower court's rationale but may affirm the entry of judgment on any independent ground rooted in the record. *See, e.g., Hachikian,* 96 F.3d at 504; *Garside,* 895 F.2d at 49.

## III. ANALYSIS

Our analysis proceeds in five parts.

### A

Trademark infringement and unfair competition laws exist largely to protect the public from confusion anent the actual source of goods or services. *See, e.g., Star Fin. Servs., Inc. v. AASTAR Mortgage Corp.,* 89 F.3d 5, 9 (1st Cir.1996); *DeCosta v. Viacom Int'l, Inc.,* 981 F.2d 602, 605 (1st Cir.1992), *cert. denied,* 509 U.S. 923, 113 S.Ct. 3039, 125 L.Ed.2d 725 (1993); 3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23.01 (3d ed. 1996). The Lanham Act is cast in this mold. Generally speaking, the Act proscribes the unauthorized use of a service mark when the particular usage causes a likelihood of confusion with respect to the identity of the service provider.[5] *See WCVB–TV v. Boston Athletic Ass'n,* 926 F.2d 42, 44 (1st Cir.1991); *see also Societe Des Produits Nestle, S.A. v. Casa Helvetia, Inc.,* 982 F.2d 633, 641 (1st Cir.1992) (explaining in respect to trademarks that "only those appropriations ... likely to cause confusion are prohibited"). Consequently, likelihood of confusion often is the dispositive inquiry in a Lanham Act case. *See, e.g., WCVB–TV,* 926 F.2d at 44; *Pignons S.A. de Mecanique de Precision v. Polaroid Corp.,* 657 F.2d 482, 492 (1st Cir.1981). So it is here.

### B

■ To demonstrate likelihood of confusion a markholder (or one claiming by, through, or under her) must show more than the theoretical possibility of confusion. *See American Steel Foundries v. Robertson,* 269 U.S. 372, 382, 46 S.Ct. 160, 162–63, 70 L.Ed. 317 (1926) (requiring probable confusion); *Star,* 89 F.3d at 10 (requiring evidence of a substantial likelihood of confusion); *accord* 3 McCarthy, *supra,* § 23.01[3][a]. Just as one

**5.** Section 32(1) of the Lanham Act governs infringement claims. It stipulates in pertinent part:

> Any person who shall, without the consent of the registrant—
> (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which *such use is likely to cause confusion,* or to cause mistake, or to deceive; ... shall be liable in a civil action by the registrant....

15 U.S.C. § 1114(1) (emphasis supplied). Section 43(a) governs unfair competition claims. It stipulates in pertinent part:

> Any person who, on or in connection with any goods or services, ... uses in commerce any word, term, name, symbol, or device ... or any false designation of origin ... which—
> (A) is *likely to cause confusion,* or to cause mistake, or to deceive as to ... the origin, sponsorship, or approval of [such person's] goods, services, or commercial activities by another person ...
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such an act.

15 U.S.C. § 1125(a) (emphasis supplied).

tree does not constitute a forest, an isolated instance of confusion does not prove probable confusion. To the contrary, the law has long demanded a showing that the allegedly infringing conduct carries with it a likelihood of confounding an appreciable number of reasonably prudent purchasers exercising ordinary care. *See McLean v. Fleming*, 96 U.S. 245, 251, 24 L.Ed. 828 (1877); *Mushroom Makers, Inc. v. R.G. Barry Corp.*, 580 F.2d 44, 47 (2d Cir.1978), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979); *Coca–Cola Co. v. Snow Crest Beverages, Inc.*, 162 F.2d 280, 284 (1st Cir.), *cert. denied*, 332 U.S. 809, 68 S.Ct. 110, 92 L.Ed. 386 (1947). This means, of course, that confusion resulting from the consuming public's carelessness, indifference, or ennui will not suffice. *See, e.g., United States v. 88 Cases, More or Less, Containing Bireley's Orange Beverage*, 187 F.2d 967, 971 (3d Cir.) (inferring that "the legislature contemplated the reaction of the ordinary person who is neither savant nor dolt, [and] who ... exercises a normal measure of the layman's common sense and judgment"), *cert. denied*, 342 U.S. 861, 72 S.Ct. 88, 96 L.Ed. 648 (1951); *see also Indianapolis Colts, Inc. v. Metropolitan Baltimore Football Club Ltd.*, 34 F.3d 410, 414 (7th Cir.1994) (explaining that the Lanham Act does not "protect the most gullible fringe of the consuming public").

 We typically consider eight factors in assessing likelihood of confusion: (1) the similarity of the marks; (2) the similarity of the goods (or, in a service mark case, the services); (3) the relationship between the parties' channels of trade; (4) the juxtaposition of their advertising; (5) the classes of prospective purchasers; (6) the evidence of actual confusion; (7) the defendant's intent in adopting its allegedly infringing mark; and (8) the strength of the plaintiff's mark. *See Star*, 89 F.3d at 10; *Sullivan*, 867 F.2d at 29. While this compendium does not conform easily to the peculiar facts of this case, it is not intended to be either all-encompassing or exclusive. *See DeCosta v. CBS, Inc.*, 520 F.2d 499, 513–14 (1st Cir.1975), *cert. denied*, 423 U.S. 1073, 96 S.Ct. 856, 47 L.Ed.2d 83 (1976). The listed factors are meant to be used as guides. *See Astra Pharmaceutical Prods., Inc. v. Beckman Instruments, Inc.*,

718 F.2d 1201, 1205 (1st Cir.1983). No one listed factor is determinative, and any other factor that has a tendency to influence the impression conveyed to prospective purchasers by the allegedly infringing conduct may be weighed by the judge or jury in gauging the likelihood of confusion. We completely agree with the authors of the Restatement that "[n]o mechanistic formula or list can set forth in advance the variety of factors that may contribute to the particular marketing context of an actor's use." Restatement (Third) of Unfair Competition § 21 cmt. a (1995).

 Two related points are worth making. First, because the listed factors must be evaluated in context, any meaningful inquiry into the likelihood of confusion necessarily must replicate the circumstances in which the ordinary consumer actually confronts (or probably will confront) the conflicting mark. *See, e.g., Libman Co. v. Vining Indus., Inc.*, 69 F.3d 1360, 1362 (7th Cir. 1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 1878, 135 L.Ed.2d 173 (1996); *Black Dog Tavern Co. v. Hall*, 823 F.Supp. 48, 55 (D.Mass.1993). Second, Rule 56 places a special gloss upon the usual analytic approach. On summary judgment the reviewing court must decide whether the evidence as a whole, taken most hospitably to the markholder, generates a triable issue as to likelihood of confusion. *See Sullivan*, 867 F.2d at 29; *Astra*, 718 F.2d at 1205; *see also* 3 McCarthy, *supra*, § 23.11 (observing that, while legal precedent governs the analysis, the result of each case is controlled by the totality of its facts).

Applying these principles, we conclude that the Union bears the burden here of adducing "significantly probative" evidence, *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2510–11 (citation omitted), tending to show that an appreciable number of prospective voters (i.e., employees within the defined bargaining unit) were in fact likely to be confused or misled into believing that the service-marked campaign literature was produced, sent, or authorized by IAM. The Union has not reached this plateau.

## C

As we set the scene for the main thrust of our analysis, we acknowledge that the campaign stump is an odd stage for playing out a Lanham Act drama. In the typical commercial setting, confusion as to the source of goods or services occurs when there is an unacceptably high risk that a buyer may purchase one product or service in the mistaken belief that she is buying a different product or service. *See, e.g., Star,* 89 F.3d at 9. But the instant case is well off the beaten track. It does not involve two entrepreneurs vying to sell competing products or services in the traditional sense. Rather, IAM was angling to represent the workers and, although Winship opposed that effort, it was neither offering nor seeking to provide a similar service. In the vernacular of the marketplace, IAM was "selling" its services to prospective union members and Winship was "selling" a negative—the lack of a need for any such services or service-provider.

This twist has significant implications for a court's assessment of the likelihood of confusion. If we assume, favorably to the Union, that confusion as to the source of the documents bearing the IAM service mark may at least indirectly deter prospective purchasers (voters within the bargaining unit) from acquiring (voting for) IAM's representational services, that deterrent will exist only if, and to the extent that, confusion causes purchasers to be misinformed about the nature or value of the services. We think it follows inexorably that, if the electorate can readily identify Winship as the source of the promotional materials, the deterrent vanishes. *See, e.g., McIntyre v. Ohio Elections Comm'n,* —— U.S. ——, —— n. 11, 115 S.Ct. 1511, 1519 n. 11, 131 L.Ed.2d 426 (1995) (suggesting that once people know the source of a writing, they can evaluate its message, and, at that point, "it is for them to decide what is responsible, what is valuable, and what is truth") (citation and internal quotation marks omitted). In that event, there is no misleading as to the genesis of the letters, and the voters can assess whether the Winship-authored handouts accurately describe the Union's services, or, instead, are merely a manifestation of Winship's no-holds-barred commitment to dissuade the voters from "purchasing" those services. Put another way, knowledge as to the source of the materials dispels incipient confusion.

The Union attempts to confess and avoid. It contends that the recipients' ability to ascertain the source of the documents does not necessarily negate confusion. This contention hinges on the theory that employees may have thought that the letters, even if delivered by the company, were actual IAM documents which Winship procured and then draped in anti-union invective. But that theory does not fit the facts: patently, this is neither an instance in which an employer distributes copies of a notice previously sent by a union to employees elsewhere and adds anti-union commentary, nor one in which an employer makes minor emendations to an authentic union document. The letters and the invoice are composed around names and circumstances indigenous to this particular organizational effort. Among other things, the letters bear a date significant in its relation to the scheduled election; they address each Winship employee by name and home address; and they identify this employer. Source-identifiers specific to the Winship election are even more pervasive in the fictitious invoice.

The Union's fallback position seems to be that, even if it is nose-on-the-face plain that the letters and the invoice are not replicas of genuine IAM materials, the affected employees still may have believed that they somehow were based on genuine materials. We think this construct is both legally unsound and factually unsupported. In the first place, a recipient's ability to recognize that the alleged infringer, at a minimum, must have substantially added to or altered a document alleviates any confusion as to its immediate source. *Cf. Warner Bros., Inc. v. American Broadcasting Cos.,* 720 F.2d 231, 246 (2d Cir.1983) (suggesting that lack of substantial similarity leaves "little basis" for asserting likelihood of confusion in a Lanham Act claim). In the second place, even indulging the arguendo assumption that the contrived documents were based on a real scenario, the alterations are sufficiently extensive that an ordinary recipi-

ent, possessing a modicum of intelligence, could not help but recognize that Winship had tampered so substantially with the documents that they could no longer be perceived as emanating from the Union.[6] In other words, the documents' credibility would depend on the voters' assessment of whether Winship was telling the truth. *See McIntyre,* —— U.S. at —— n. 11, 115 S.Ct. at 1519 n. 11 (discussing the value of knowing "the identity of the source" for the purpose of judging the truthfulness of ideas contained in a writing). We conclude, therefore, with regard to these documents, that as long as employees can ascertain either who authored or who substantially modified the literature, they will readily recognize the entire document (including the letters, in one case, and the invoice, in the second case) as propaganda, and they will be in a position to gauge its accuracy accordingly.

This emphasis on source recognition takes into account the setting and the juxtaposition of the parties. Labor-management relations have not mellowed since Justice Clark observed three decades ago that representational campaigns "are ordinarily heated affairs ... frequently characterized by bitter and extreme charges, countercharges, unfounded rumors, vituperations, personal accusations, misrepresentations and distortions." *Linn v. United Plant Guard Workers of Am., Local 114,* 383 U.S. 53, 58, 86 S.Ct. 657, 660–61, 15 L.Ed.2d 582 (1966). Because exaggeration, sometimes crossing the line into outright falsehood, is a staple in such campaigns, "consumers" (i.e., affected workers) are on notice that both sides likely will embellish with scant regard for the con-

fining restraints imposed by the truth. *See Baumritter Corp. v. NLRB,* 386 F.2d 117 (1st Cir.1967) (explaining that inaccuracies are indigenous to campaign propaganda in the labor relations milieu). The acrimonious literature disseminated by both parties indicates that this campaign was no exception to the rule.[7]

**D**

■ Having woven the contextual tapestry against which the Union's claims must be viewed, we turn now to the octet of factors that typically inform the likelihood of confusion. While the strange configuration of this case renders certain of those factors irrelevant or, at least, difficult to apply—square pegs never fit snugly in round holes—we make the effort in the interest of completeness. Moreover, other relevant circumstances compensate to some degree for this lack of fit and we intersperse them throughout our discussion. We deem such circumstances to be of especially great importance here precisely because this case falls well outside the customary confines of the Lanham Act.

**1. *Similarity of Marks.*** The service mark used by Winship is not merely similar; it is identical—a photocopied reproduction. Still, similarity is determined on the basis of the designation's total effect, *see, e.g., Pignons,* 657 F.2d at 487 (considering additional, source-identifying words printed on goods and substantial differences in packaging), and infringement "does not exist, though the marks be identical and the goods very similar, when the evidence indicates no [likeli-

6. An analogous principle in copyright law is instructive. Absent direct evidence of copyright infringement, a plaintiff must prove "substantial similarity" between the copyrighted and contested materials. *See, e.g., NEC Corp. v. Intel Corp.,* 10 U.S.P.Q.2d 1177, 1183, 1989 WL 67434 (N.D.Cal.1989). The applicable test is "whether the work is recognized by an observer as having been taken from the copyrighted source." *Id.* at 1184. Even if a work is copied, however, no copyright infringement exists if substantial changes render the work unrecognizable. *See v. Durang,* 711 F.2d 141, 142 (9th Cir.1983) (affirming grant of summary judgment for the defendant); *NEC Corp.,* 10 U.S.P.Q.2d at 1186–87; *cf.* A. Dean Johnson, *Music Copyrights: The Need for an Appropriate Fair Use Analysis in Digital Sam-*

*pling Infringement Suits,* 21 Fla.St.U.L.Rev. 135, 158–59 (1993) (noting greater likelihood of fair use in copyright cases if alterations render an original music recording unrecognizable).

7. For example, one IAM flier of the "when did you stop beating your wife?" variety, asks: "WHAT LIES OR HALF TRUTHS DO[ES WINSHIP] PLAN TO SPREAD DURING OUR DEBATE?" The IAM materials also describe anticipated "company tactics" or "tricks" in unflattering terms and warn employees to "LOOK OUT FOR CORPORATE TRAPS." The Winship literature, discussed above, speaks for itself.

hood of confusion]." *James Burrough Ltd. v. Sign of the Beefeater, Inc.*, 540 F.2d 266, 274 (7th Cir.1976). What is more, we have recognized that in certain circumstances otherwise similar marks are not likely to be confused if they are used in conjunction with clearly displayed names, logos or other source-identifying designations of the manufacturer. *See Aktiebolaget Electrolux v. Armatron Int'l, Inc.*, 999 F.2d 1, 4 (1st Cir. 1993); *Pignons*, 657 F.2d at 487. Here, the lengthy propagandistic message that Winship printed in large type on the fictitious invoice and the conspicuous, easily identifiable fliers it sent to introduce the letters dilute the inference that might otherwise be drawn from the similarity between the marks.

**2. *Similarity of Services.*** Because the parties do not offer competing services, there is no similitude. Furthermore, even if the documents are evaluated in the abstract, we do not think that any reasonable person, viewing them in their entirety and in conjunction with the accompanying materials, would find them similar to IAM's authentic campaign literature.

On the one hand, any similarity to actual IAM materials is limited to the vitriolic tone, the presence of the IAM service mark, and the facsimile signature. On the other hand, unlike any genuine IAM communication, the letters are postdated by a full year and address the employees as if they already had opted in favor of union representation. The next piece of propaganda (the invoice) contains anti-union messages that are longer and much more prominent than any other text. And, moreover, in stark contrast to handbills distributed by IAM which invariably urged employees to vote "yes" (i.e., for a union), the letters at issue were attached to rabidly anti-union fliers exhorting employees to vote "no" (i.e., against a union). In short, the bogus letters, when compared to the real McCoy, are distinctive in appearance and antithetical in content. Given such gross dissimilarities, it cannot reasonably be inferred that ordinarily prudent workers would be likely to confuse the source of the letters. *See Senco Prods., Inc. v. International Union of Elec. Workers*, 311 F.Supp. 590, 592 (S.D.Ohio 1970) (finding no likelihood of confusion as to sponsorship of handbills circulated by a union bearing employer trademark in bold print on the first line, followed by union identifiers of equal prominence).

**3–5. *Channels of Trade and Advertising; Classes of Prospective Purchasers.*** Following circuit precedent, *see Equine Technologies, Inc. v. Equitechnology, Inc.*, 68 F.3d 542, 546 n. 5 (1st Cir.1995), we address the next three factors in the ensemble. The parties' channels of trade are widely disparate (reduced to bare essence, IAM sells representational services whereas Winship sells nursing home beds), and there is no evidence that the channels advertising those services are similar.

To be sure, as the election campaign picked up steam, both parties propagandized (and, in that sense, advertised) through the same medium (print), and both of them targeted exactly the same narrowly-defined cadre of individuals. The class of prospective purchasers is necessarily restricted to those individuals and is, therefore, identical. Still, that identicality does not advance the Union's cause in the special circumstances of this case.

 On this point, the requisite inquiry is not limited merely to determining whether the class of prospective purchasers is the same or different. Instead, a court called upon to assay likelihood of confusion must ponder the sophistication of the class, thereby taking account of the context in which the alleged infringer uses the mark. *See, e.g., Astra*, 718 F.2d at 1206–07; *HQ Network Sys. v. Executive Headquarters*, 755 F.Supp. 1110, 1118–19 (D.Mass.1991). Here, the organizational effort began in May. Among other things, the Union held open meetings and sent the affected workers periodic "organizing updates." Thus, by late July—when Winship began to distribute the challenged documents—persons within the class could not help but know of the ongoing campaign and of its excesses.

 We must presume that the class members are of normal intelligence, *see McLean*, 96 U.S. at 251; *Church of the Larger Fellowship, Unitarian Universalist v. Conservation Law Found. of New Eng., Inc.*, 221

U.S.P.Q. 869, 873, 1983 WL 52338 (D.Mass. 1983), and the previous months' electioneering would have given them a certain degree of enforced sophistication. Common sense dictates that this group—above all others—would filter the rivals' claims through the seine of this knowledge. *Cf. Linn*, 383 U.S. at 60–62, 86 S.Ct. at 662–63 (discussing the NLRB's toleration of abusive and inaccurate statements made during organizational campaigns and agreeing that the ultimate appraisal of such statements must be left to the good sense of those voting in the elections). Accordingly, class members were especially unlikely to be misled by Winship's unauthorized use of the IAM mark.

**6. *Actual Confusion.*** IAM proffers Dale Hartford's affidavit as the mainstay of its case (indeed, its solitary piece of evidence) on the issue of actual confusion. The affidavit states briefly that "several" employees asked whether Hartford had in fact written the letter that bore his signature.[8] It also reports that one employee questioned whether she would be required to pay $300 in dues and a $200 initiation fee. Hartford opines that "these figures seem to have had to have come from [the apocryphal union invoice]." This evidence, standing alone, is insufficient to prove actual confusion.

The fundamental problem with the Hartford affidavit is that, even taking its contents as literally true, it does not undermine what is perfectly obvious from a reading of the record: no person of ordinary prudence and normal intelligence, aware of what was happening around her, would have been confused as to the source or sponsorship of the letters. For one thing, the inquiries to which Hartford alludes reveal at most that employees doubted whether he would have written a letter unfavorable to the very cause he had labored to promote. On their face, these inquiries do not evince actual confusion as to the source of the jury-rigged documents. *See* Restatement (Third) of Unfair Competition § 23 cmt. c (1995) ("Evidence of inquiries by customers as to whether the plaintiff and the defendant are associated ... may

not establish the existence of actual confusion if the nature of the inquiries indicates that consumers perceive a difference between the designations and are skeptical of the existence of a connection between the users.").

For another thing, skepticism is particularly rampant—and wise—as to claims made in the course of *any* organizing drive. In the course of *this* organizing drive—a struggle which incited more than its share of hyperbole on both sides—class members had ample reason to be skeptical. They must have known that Winship distributed the fliers (which embodied the letters), and they therefore knew that the letters had to be viewed in light of Winship's motivation. In all events, forewarned is forearmed, *see* Miguel de Cervantes, *Don Quixote de la Mancha* (circa 1615), and, here, the Union disseminated literature in the early going predicting that management would stoop to dubious tactics.

The question about dues is an even thinner reed. A lone inquiry does not indicate probable confusion of an appreciable number of purchasers. *See Mushroom Makers*, 580 F.2d at 47. Regardless, this lone inquiry—which questioned the *veracity* of the prediction concerning union dues—does not indicate confusion as to the *source* of the fictitious invoice. *See Pignons*, 657 F.2d at 490 (finding consumer's letter expressing surprise at perceived affiliation between competing companies "clearly insufficient" to prove actual confusion).

■ The Union strives to persuade us that, no matter how paltry the evidence of actual confusion, it is nonetheless adequate to survive testing on summary judgment where we must accept all reasonable inferences favorable to the nonmovant. We are not convinced. The core purpose of the summary judgment procedure is to "pierce the boilerplate of the pleadings" and evaluate the proof to determine whether a trial will serve any useful purpose. *Wynne v. Tufts Univ. Sch. of Med.*, 976 F.2d 791, 794 (1st Cir.1992),

---

8. Although Hartford recalled that these statements were made in front of approximately ten other employees at a union meeting, he claimed that he could not locate the list of attendees and,

consequently, could not name either the persons who made inquiry of him or those who overheard the queries.

*cert. denied,* 507 U.S. 1030, 113 S.Ct. 1845, 123 L.Ed.2d 470 (1993). Consequently, summary judgment cannot be sidestepped by pointing to evidence that is merely colorable or suggestive, *see, e.g., Mack,* 871 F.2d at 181, or evidence that lacks substance, *see, e.g., Mesnick v. General Elec. Co.,* 950 F.2d 816, 822 (1st Cir.1991), *cert. denied,* 504 U.S. 985, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992), or evidence that is inherently incredible, *see, e.g., United States v. Joost,* 92 F.3d 7, 14 (1st Cir.1996).

In this instance, the Union submitted no affidavits from any individuals who personally received the campaign literature,[9] and we think that it is inherently implausible to infer from the inquiries described by Hartford that prospective voters actually were confused as to the source of the materials. The summary judgment paradigm requires us to draw and respect only *reasonable* inferences; we need not infer that which is farfetched or fantastic. *See Sheinkopf v. Stone,* 927 F.2d 1259, 1262 (1st Cir.1991); *Medina–Munoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir.1990); *Raskiewicz v. Town of New Boston,* 754 F.2d 38, 45 (1st Cir.), *cert. denied,* 474 U.S. 845, 106 S.Ct. 135, 88 L.Ed.2d 111 (1985). Here, the face of the documents, the accompanying fliers, the environment in which they were distributed, and the lack of significantly probative evidence of actual confusion combine to render unreasonable the inference that IAM would have us draw.

7. *Intent.* IAM relies heavily on the principle that when an alleged infringer intentionally copies a trademark, it may be presumed that she intended to cause confusion and profit thereby.[10] *See Sullivan,* 867 F.2d at 34. But the presumption is inapposite in situations where there is no persuasive evidence of any intent to use the mark to suggest official sponsorship. *See WCVB–TV,* 926 F.2d at 45–46 (attaching considerable importance to the alleged infringers' contemporaneous offer to broadcast disclaimers, thus making clear that they were not official sponsors of the trademarked product).

The template of this case is similar to that of *WCVB–TV.* Winship incorporated the bogus documents in fliers prominently displaying anti-union commentary and containing pleas by named managers for votes against unionization. In addition, the fake invoice itself includes what amounts to a conspicuous disclaimer. Under the circumstances, no reasonable factfinder could conclude, notwithstanding Winship's purposeful misappropriation of the IAM service mark, that the company intended to mislead employees about the source of the handouts.

8. *Strength.* Under the Lanham Act strong marks enjoy the greatest protection against infringement. *See Aktiebolaget,* 999 F.2d at 5; *Pignons,* 657 F.2d at 492. The IAM service mark is robust, having been duly registered and widely promoted for over thirty years. But the muscularity of a mark, in and of itself, does not relieve the markholder of the burden to prove a realistic likelihood of confusion. *See Aktiebolaget,* 999 F.2d at 5; *Pignons,* 657 F.2d at 492. Because the Union has utterly failed to produce evidence sufficient to meet that burden, *see supra,* the mark's strength cannot carry the day.

**E**

After giving due weight to each factor and considering the unique circumstances that necessarily inform our analysis, we find no colorable basis for a likelihood of confusion, and, hence, no trialworthy Lanham Act claim. In reaching this conclusion we stress the significance of the factual setting. Here, the ambiance powerfully influenced the impression conveyed by Winship's unauthorized

---

**9.** In point of fact, the only such affidavit in the record—that of an employee named Gail Snipe—states unequivocally that she "recognized all of the materials ... to be my employer's campaign materials." She adds: "The face of the documents as well as the context in which the documents were presented made it clear that the campaign materials were from the employer, not the IAM."

**10.** This rebuttable presumption works with maximum efficiency in the commercial setting. There, an infringer typically copies a trademark to palm off her own goods as those of a recognized manufacturer, thereby free riding on the markholder's reputation and goodwill. *See generally* McCarthy, *supra,* § 25.01. The presumption works less well in cases that do not involve competitors.

use of the IAM service mark. The parties' preparations for the election inflamed the historic enmity between labor and management and colored the communications distributed by both protagonists. The climate inevitably conditioned voters to view with suspicion any claims made by either party about the other. This suspicion peaked shortly before the election, and that is when the offending documents surfaced. Moreover, the documents, when received, were affixed to clearly identifiable management propaganda. These additional, relevant circumstances counsel persuasively against any realistic possibility of confusion as to the source or sponsorship of the mismarked literature.

## IV. CONCLUSION

Considering the record as a whole in the light most favorable to the summary judgment loser, we hold that there is no triable issue of fact as to likelihood of confusion. It is simply inconceivable that employees who received the challenged literature at the height of a fiercely disputed union organizing campaign would, upon even a cursory glance, be apt to believe that IAM either distributed or contributed in any meaningful way to these vociferously anti-union tracts.

We add a postscript. The employer wins this appeal, but not our admiration. While we strongly disapprove of Winship's misappropriation of IAM's service mark, however, the Union has other available remedies to redress that infraction. *See, e.g., Linn,* 383 U.S. at 61, 86 S.Ct. at 662 (approving state-law remedy in analogous circumstances). For our part, we are unwilling to stretch the Lanham Act into unfamiliar contours simply for the sake of punishing conduct that we deplore. While we are not willing to venture quite as far into uncharted waters as our concurring colleague—after all, unlike the

authorities on which she primarily relies, *see post,* this case involves neither a political campaign nor a parody—the policy concerns that undergird her views fortify our resolve to hold the line. By like token, the special circumstances that the district court described at length, *see IAM,* 914 F.Supp. at 653–56—such as the noncommercial nature of the unauthorized use, the absence of any competition between the parties in the representational services market, and the fact that Winship did not appropriate the mark for use "in connection with" any services of its own—point in the same direction.[11] We need go no further.

*Affirmed.*

SARIS, District Judge, concurring.

I concur on the ground that Winship Green's misuse of the union's trademark in its campaign literature during the union election is not a commercial use of the mark adumbrated by Sections 32 or 43(a) of the Lanham Act, as amended, 15 U.S.C. §§ 1114(1), 1125 (1994).

### I

The union alleges that Winship Green's use of its trademark during the election violated Sections 32 and 43(a) of the Lanham Act.

### A

Section 32 of the Lanham Act concerns "trademark infringement" and proscribes misuse of another's registered trademark in commerce "in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive."[12] 15 U.S.C. § 1114(1)(a) (1994).

---

11. We take no view of the concurring opinion's suggested holding, the grounds on which the district court premised its ruling, or the other theories urged by Winship in support of the judgment below. While the Union's case may be vulnerable on several fronts, the absence of any meaningful confusion renders further comment supererogatory.

12. Section 32 of the Lanham Act, as amended, states in pertinent part:

 (1) Any person who shall, without the consent of the registrant—

 (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection

**208**

## B

Section 43(a) provides broader protection, prohibiting "unfair competition" by use of any mark, registered or not. *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768, 112 S.Ct. 2753, 2757, 120 L.Ed.2d 615 (1992). Section 43(a) prohibits two types of activities: "false designations of origin," 15 U.S.C. § 43(a)(1)(A) ("Prong (A)") and "false descriptions," 15 U.S.C. § 43(a)(1)(B) ("Prong (B)").[13] *See Truck Components, Inc. v. K–H Corp.*, 776 F.Supp. 405, 409 (N.D.Ill.1991); 3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 27.02[3] (3d ed. 1996) (discussing history of the "two prongs" of § 43(a)— § 43(a)(1)(A)) ("trademark infringement") and § 43(a)(1)(B) ("false advertising").

Prong (A)[14] prohibits false designations of the origin or sponsorship of goods or services. 15 U.S.C. § 1125(a)(1)(A) (1994). Typical claims under prong (A) would involve a new trademark that was confusingly similar to an already established one, or an attempt by a defendant to "palm-off" its goods as those of a competitor by use of the competitor's mark. *See Truck Components*, 776 F.Supp. at 409; *McCarthy on Trademarks, supra*, at § 27.02[4] (describing these claims as "trademark infringement").

In contrast, the protection under prong (B) is very different. Following its amendment in 1988, prong (B) creates liability for misrepresentations in commercial advertising or promotion as to the "nature, characteristics, qualities or geographic origin" of *another*

> with which such use is likely to cause confusion, or to cause mistake, or to deceive ...
>
> \* \* \* \* \* \*
>
> shall be liable in a civil action by the registrant for the remedies hereinafter provided....
> 15 U.S.C. § 1114(1) (1994).

**13.** Section 43(a) of the Lanham Act, as amended, states in pertinent part:

> § 1125. *False designations of origin and false descriptions forbidden*
> (a) Civil action. (1) Any person who, on or in connection with any goods and services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

person's goods or services. 15 U.S.C. § 1125(a)(1) (1994); *see also* Trademark Law Revision Act, Pub.L. 100–667, § 132, 102 Stat. 3946 (1988); *U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia*, 898 F.2d 914, 921 (3d Cir.1990) (discussing effect of 1988 amendment to Lanham Act); *McCarthy on Trademarks, supra*, at § 27.02[4]. The Senate Committee Report accompanying this amendment explained the need for this addition to the Act as follows:

> In one important area, however, the courts have refused to apply the section. Based on a 1969 seventh circuit decision, the courts have held that Section 43(a) applies only to misrepresentations about one's own products and services; it does not extend to misrepresentations about competitor's products or services. *Bernard Food Indus. v. Dietene Co.*, 415 F.2d 1279, 163 USPQ [264] 265 (7th Cir.1969), *cert. denied*, 397 U.S. 912, 90 S.Ct. 911, 25 L.Ed.2d 92, 164 USPQ 481 (1970). The committee agrees that this effect is illogical on both practical and public policy levels and that the public policy of deterring acts of unfair competition will be served if Section 43(a) is amended to make clear that misrepresentations about another's products are as actionable as misrepresentations about one's own.

S.Rep. No. 515, 100th Cong., 2d Sess. (1988), *reprinted in* 1988 U.S.C.C.A.N. 5577; *see also McCarthy on Trademarks, supra*, at § 27.02[4] (stating that 1988 amendment codified "two prongs" of § 43(a): "part one

> (A) is likely to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or another person's goods, services, or commercial activities.
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.
> 15 U.S.C. § 1125(a) (1994) (emphasis in original).

**14.** In 1992 Congress redesignated paragraphs (1) and (2) of section 43(a) as subparagraphs (A) and (B). *See* Oct. 27, 1992, Pub.L. 102–542, § 3(c), 106 Stat. 3568.

relat[ing] to ... unregistered trademark, tradename and trade dress infringement claims, and part two relat[ing] to ... false advertising (as well as trade libel) claims"). Thus, prong (B) prohibits misrepresentations about the quality of a defendant's own goods—even where the misrepresentations do not tend to confuse its goods with those of a competitor or otherwise misstate the origin of the goods—as well as affirmative misrepresentations about another's products. *Truck Components,* 776 F.Supp. at 409 (citing *In re Uranium Antitrust Litigation,* 473 F.Supp. 393, 408 (N.D.Ill.1979)); *see also McCarthy on Trademarks, supra,* at § 27.04 (describing elements of prima facie case under prong (B)).

## II

I am in agreement with the majority that the origin and sponsorship of the allegedly infringing documents was never in doubt. With respect to section 43(a) of the Lanham Act, prong (A) is inapplicable because there is no evidence, or even contention, that the company used the union's mark to deceive bargaining unit members as to the affiliation of the company with the union or as to the sponsorship of its services by the union. Quite the contrary.

However, there is evidence that Winship Green used the union's trademark to misrepresent the characteristics and nature of the union's services (i.e., the amount of union dues or the purportedly draconian results of failure to pay them), thereby implicating prong (B), governing false descriptions. *Cf. Energy Four, Inc. v. Dornier Medical Systems, Inc.,* 765 F.Supp. 724, 730 (N.D.Ga. 1991) (describing cause of action for misrepresentation under Section 43(a)(1)(B) and collecting cases); *Brandt Consol., Inc. v. Agrimar Corp.,* 801 F.Supp. 164, 174 (C.D.Ill. 1992) (same); *McCarthy on Trademarks, supra,* at § 27.04 (same). Because this evidence that the company misrepresented the union's services may be sufficient for the fact-finder to find confusion as to the "nature, characteristics, [or] qualities" of the union's services, I would not allow summary judgment for the company under prong (B) on the ground of a lack of confusion.

## III

A firm ground for summary judgment, it seems to me, is that the Lanham Act creates no liability because the deception did not occur in connection with commercial sales or advertising, as required under the Act, but rather in campaign hand-outs.

The Lanham Act protects only against certain *commercial* uses of trademarks. Section 32 governs the use of a registered mark "in commerce ... in connection with the sale, offering for sale, distribution, or advertising of any goods or services." 15 U.S.C. § 1114(1)(a) (1994). Section 43(a) is likewise limited to uses of marks "in commerce," 15 U.S.C. § 1125(a)(1) (1994), which the Act defines as using or displaying a mark in the sale or advertising of goods or services,[15] *see* 15 U.S.C. § 1127 (1994). And, section 43(a)(1)(B) limits misrepresentation claims to those cases involving "commercial advertising or promotion." 15 U.S.C. § 1125(a)(1)(B) (1994).

While there is no appellate case directly on point, trial courts have rejected efforts to extend the Lanham Act to cases where the defendant is not using or displaying the trademark in the sale, distribution or advertising of its goods or services. *See Lucasfilm Ltd. v. High Frontier,* 622 F.Supp. 931, 934 n. 2 (D.D.C.1985) (rejecting the claim that advertising companies could be held liable for using the trade name "Star Wars" in the political debate over a national policy because the trademark laws only reach activities in which a trademark is used in connec-

---

**15.** 15 U.S.C. § 1127 states in pertinent part:

The term "use in commerce" means the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark. For purposes of this chapter, a mark shall be deemed to be in use in commerce—

* * * * * *

(2) on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce, or the services are rendered in more than one State or in the United States and a foreign country and the person rendering the services is engaged in commerce in connection with the services.

tion with selling or advertising services of commercial or noncommercial defendants); *Stop the Olympic Prison v. United States Olympic Comm.*, 489 F.Supp. 1112, 1124 (S.D.N.Y.1980) (expressing serious doubts as to whether the Lanham Act applies to the deceptive use of the Olympic trademark by a group opposing the conversion of Olympic facilities into a prison, in part because "there is no suggestion that the alleged deception was in connection with any goods or services"); *Reddy Communications, Inc. v. Environmental Action Found.*, 477 F.Supp. 936, 946 (D.D.C.1979) (rejecting claim that an environmental group's caricature of an energy industry service mark violated the Lanham Act where the company failed to prove that the environmental group used the service mark to "identify or promote" the sale of its publications); *see generally L.L. Bean, Inc. v. Drake Publishers, Inc.* 811 F.2d 26, 32 (1st Cir.1987) (holding under a state anti-dilution state that a parody was not a commercial use of plaintiff's mark because the publisher "did not use Bean's mark to identify or market goods or services to consumers"), *cert. denied*, 483 U.S. 1013, 107 S.Ct. 3254, 97 L.Ed.2d 753 (1987).

Nonetheless, some forms of union-related activity may constitute commercial sale or advertising that is protected under the Act. *See, e.g., Brach Van Houten Holding, Inc. v. Save Brach's Coalition for Chicago*, 856 F.Supp. 472, 475–476 (N.D.Ill.1994) (finding Lanham Act protection applicable where union used company logo in connection with the sale and distribution of its buttons and stickers and solicitation of donations to support the coalition's opposition to a plant closing and was likely to cause confusion as to the company's affiliation with, or approval of, defendant's proposals); *Marriott Corp. v. Great Am. Serv. Trades Council, AFL–CIO*, 552 F.2d 176, 179 (7th Cir.1977) (rejecting the union's contention that the National Labor Relations Board had exclusive jurisdiction over an action for trademark infringement arising under the Lanham Act where the union allegedly used the company's trademark in advertisements which suggested an affiliation between the company and the union in advertising its services to prospective employees). However, such commercial activity is simply not present here.

Accordingly, the union's limited property right under the Lanham Act against commercial misuse of its trademark is not implicated in this case. *See generally Lucasfilm Ltd.*, 622 F.Supp. at 933 ("It is well established that the property right conferred by a trademark is very limited."). While the union rightfully complains about the company's unfair tactics, it must find its federal remedy for deceptive campaign literature under the National Labor Relations Act, 29 U.S.C. §§ 141 *et seq.* (1994). *See Linn v. United Plant Guard Workers of Am., Local 114*, 383 U.S. 53, 60, 86 S.Ct. 657, 662, 15 L.Ed.2d 582 (1966) (permitting libel action under state law for defamatory statements published during a union organization campaign and discussing authority of the National Labor Relations Board to set aside elections where "a material fact has been misrepresented in the representation campaign; opportunity for reply has been lacking; and the misrepresentation has had an impact on the free choice of the employees participating in the election").

Because the Court reaches the same conclusion for somewhat different reasons, I join in its judgment.