**WHS ENTERTAINMENT VENTURES, et al.**

v.

**UNITED PAPERWORKERS INTERNATIONAL UNION**

No. 3:97–1114.

United States District Court, M.D. Tennessee, Nashville Division.

March 11, 1998.

Lee Webb Campbell, II, Andrew J. Pulliam, Sherrard & Roe, Nashville, TN, Steven R. Gustavson, Parker H. Bagley–Bakers Botts, L.L.P., New York City, for Plaintiffs.

Lynn Allen Agee, United Paperworks Int'l, Nashville, TN, Mark Milton Brooks, Nashville, TN, Michael T. Anderson–Davis, Cowell & Bowe, San Francisco, CA, for Defendant.

## MEMORANDUM

JOHN T. NIXON, Chief Judge.

Pending before the Court is the Defendant's Motion to Dismiss (Doc. No. 7), to which the Plaintiffs have filed a Response (Doc. No. 11). The Defendant in turn has filed a Reply (Doc. No. 13). For the reasons more fully elaborated below, the Court hereby grants the Defendant's motion, dismisses the federal claims in this action with prejudice, and dismisses the state law claims without prejudice for lack of jurisdiction.

## I. BACKGROUND

The Wildhorse Saloon is a three-story restaurant and country music dance club situated on Second Avenue at the heart of downtown Nashville. The Wildhorse Saloon features a 3,300–square foot dance floor and stage, and is the location for the taping of the shows "Wildhorse Saloon" and "Wildhorse Saloon Concerts," both of which are broadcast over the Nashville Network (TNN) and watched by millions of viewers. It is legendary among country music fans, and has been labeled "the most celebrated 'honky-tonk' since Gilley's near Houston was immortalized in the 1980 John Travolta movie 'Urban Cowboy.'" Joe Edwards, *Emphasis is on Dancing at Wildhorse Saloon,* Peoria Journal Star, Jan. 2, 1990 at C–6. Approximately a million people per year visit the Wildhorse Saloon to eat, dance, and listen to country music stars such as Merle Haggard, Alan Jackson, Kris Kristofferson, and Waylon Jennings. *Id.* Even Tennessee's own Albert Gore has been known to

patronize the Saloon, though he has discreetly refrained from testing the dance floor. *Id.*

As of late, however, the Saloon has attracted more than just the regular two-stepping crowd. Much to the Saloon management's consternation, in recent months its patrons have been approached by representatives of the United Paperworkers International Union ("Union"), the Defendants in this case. The representatives have been distributing flyers bearing a parody of the trademarked Wildhorse Saloon logo[1] and listing a series of health violations, including such infractions as "dirty towels on plates," and "fruitflies over utensil bins," which were found by a health inspector at the Wildhorse Saloon restaurant. Below the list of health violations, the flyers also include: (1) a disclaimer stating that the health violations are not necessarily ongoing; (2) the words "A Public Service," and "UPIU Special Projects;" (3) a telephone number; and (3) a date, October 1997. It appears that the health violations reported in the flyers are accurate, as they were obtained by the Union's attorney from the Nashville, Tennessee Health Department. (*See* Brooks Aff. ¶ 2.) Presumably, the phrase "A Public Service" is included to highlight the public interest nature of the flyers, although the Union was motivated to target the Wildhorse Saloon because of its labor dispute with a distantly related company. Specifically, the Union's dispute is with Shepherd Tissue, a company which has a common investor with Levy Limited Partnership ("Levy"), the manager of the Wildhorse Saloon Restaurant. It is not been alleged that the leafleting has been anything but peaceful.

The Plaintiffs, WHS Entertainment Ventures, the owner of the Wildhorse Saloon, WHS Licensing Limited Partnership, the owner of the Wildhorse Saloon Trademark,[2]

and Levy, seek compensatory and injunctive relief against the Union. They have asserted several causes of action, including violations of the Lanham Act, 15 U.S.C.A. §§ 1501 *et seq.*, Tennessee trademark law, interference with prospective economic advantage, and unfair competition. However, the parties have most extensively briefed the issue of whether the Union's actions violate the Plaintiffs' trademark rights under the Lanham Act.

## II. LEGAL STANDARD

A motion under Rule 12(b)(6) of the Federal Rules of Civil Procedure tests whether a cognizable claim has been pleaded in the complaint. *Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 436 (6th Cir.1988). Under Rule 8(a) of the Federal Rules, a complaint "shall contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a). However, a complaint "need not set down in detail all the particularities of a plaintiff's claim." *Gazette v. City of Pontiac*, 41 F.3d 1061, 1064 (6th Cir.1994) (quoting *Westlake v. Lucas*, 537 F.2d 857, 858 (6th Cir.1976)). Dismissal of a claim pursuant to Rule 12(b)(6) is appropriate only if it appears beyond doubt that a plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). For purposes of a motion to dismiss, the allegations of the plaintiff's complaint are liberally construed and taken as true, and shall be given the benefit of all reasonable inferences. *See Cameron v. Seitz*, 38 F.3d 264 (6th Cir.1994); *Westlake*, 537 F.2d at 858.

## III. DISCUSSION

### A. *Lanham Act*

The Plaintiffs have asserted causes of action under both Sections 43(a) and 43(c) of

---

1. The logo featured in the flyers depicts a drawing of a long-maned horse enclosed by two rings of triangles. The rings are broken by the words "WILDHORSE" above the horse, and "SALOON" below it. The logo is nearly identical to the trademarked Wildhorse Saloon logo, except that the horse in the flyers is emaciated and has drops of sweat running from its face, while the horse in the actual logo is muscular and healthy.

2. WHS Licensing Limited Partnership is the holder of the Service Mark "Wildhorse Saloon," which was registered originally by Nuckolls, Inc.—Registration No. 1,965,992, and is dated April 2, 1996. Furthermore, WHS Licensing own the Wildhorse Saloon Design Service Mark, which has a Registration Number 2,045,167, and is dated March 11, 1997. The Service Mark was also originally obtained by Nuckolls, Inc.

the Lanham Act, 15 U.S.C.A. §§ 1125(a) & (c) (West 1998), respectively, for trademark infringement and dilution. The relevant portions of the statute read as follows:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, *uses in commerce* any word, term, name, symbol, or device, or any combination thereof ... which—(A) is *likely to cause confusion,* or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities or geographic origin of his or her or another person's goods, services, or commercial activities,—shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act.

15 U.S.C.A. § 1125(a) (Lanham Act § 43(a)) (emphasis added).

> (1) The owner of a famous mark shall be entitled ... to an injunction against another person's commercial *use in commerce* of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark and to obtain such other relief as provided in this subsection.

15 U.S.C.A. § 1125(c) (Lanham Act § 43(c)) (emphasis added).

As emphasized above, both of these causes of action under the Lanham Act require that the alleged trademark infringer have misappropriated the mark in the course of commerce. Furthermore, Section 1125(a) necessitates a showing that the challenged use of the trademark has a likelihood of causing confusion. The Plaintiffs' inability to prove these two factors in particular prevents them from pursuing causes of action for trademark infringement and dilution against the Union.

### B. *Use in Commerce*

■ The term "use in commerce" is defined in the Lanham Act, and its precise definition merits extensive quoting. "Use in commerce" is defined in 15 U.S.C.A. § 1127 as:

> [T]he bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark. For purposes of this chapter, a mark shall be deemed to be in use in commerce—(1) on goods when—(A) it is placed in any manner on the goods ... and (B) the *goods are sold or transported in commerce,* and (2) on services when it is used or displayed in *the sale or advertising of services* and the services are rendered in commerce....

(Emphasis added.) Given this definition, it is clear that the Union's conduct does not fit within the reach of the term "use in commerce." If the flyers being distributed by the Union are themselves considered "goods," these "goods" are not "sold or transported in commerce," as required by the Act. The flyers are not being sold, as the Union is distributing these flyers for the purposes of publicizing the Wildhorse Saloon's health violations, at no cost to the recipient. *Cf. Tax Cap Committee v. Save Our Everglades, Inc.,* 933 F.Supp. 1077, 1081 (S.D.Fla.1996) (distributing petitions among Florida's registered voters not considered selling or transporting goods in commerce); *L.L. Bean, Inc. v. Drake Publishers, Inc.,* 811 F.2d 26, 33 (1st Cir.1987) (parody of the L.L. Bean catalog on the "humor and parody" section of High Society magazine was not used to "identify or market" the magazine's goods or services); *see also* Harriette K. Dorsen, *Satiric Appropriation and the Law of Libel, Trademark and Copyright: Remedies Without Wrongs,* 65 B.U.L.Rev. 923, 941 (1986) (satiric use of a trademark is not "for the purpose of selling other goods or services"). Furthermore, the flyers are not being "transported in commerce" because the Plaintiffs have alleged that they have only been distributed "on the premises at the Restaurant and immediately outside the Restaurant." (Compl.¶ 14.) This limited geographical area in which the flyers are being distributed cannot by any stretch of the term be considered a "transportation" of the flyers in commerce.

Furthermore, the Union's use of the trademark was not related to the "sale or advertis-

ing of a service." The parody of the Wildhorse Saloon logo exhibited on the flyers distributed by the Union were not used to sell the Union's services, or for that matter, to promote the Union entity itself. The Union was not using the Wildhorse Saloon logo in flyers that were intended, for example, to attract new members, or to solicit donations. It is true that the flyers were used to further the Union's position in a labor dispute, and the act of negotiating on behalf of union members is, in turn, a service that is provided by the Union. However, this action is too far removed from the "sale or advertising" of the Union's services to be considered as such under the Lanham Act. *Cf. L.L. Bean,* 811 F.2d at 33 (parody of the L.L. Bean catalog on the "humor and parody" section of High Society magazine was not in connection with the marketing or identification of High Society's goods or services); *Tax Cap Committee,* 933 F.Supp. at 1081 (distributing petitions for a political purpose is not "selling or advertising" a service in commerce because the petitions are not used to solicit funds, volunteers, or supporters for the organization); *Lone Star Steakhouse & Saloon v. Longhorn Steaks,* 106 F.3d 355, 362 (11th Cir.) (displaying a mark on an interior wall of a restaurant did not "constitute a valid service mark use because it was not being used to identify or distinguish the services being offered"), *modified on reh'g on other grounds,* 122 F.3d 1379 (11th Cir.1997); *see also* Dorsen, 65 B.U.L.Rev. at 941 (satiric use of a trademark is not "for the purpose of selling other goods or services"); RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 18 (1995) ("A designation is 'used' as a trademark . . . when the designation is displayed or otherwise made known to prospective purchasers in the ordinary course of business in a manner that associates the designation with the goods [or] services.").

Although the Court's research has not uncovered any federal opinions in the Sixth Circuit which discuss whether the distribution of flyers during a labor dispute can be considered a "use in commerce," at least one other judge has agreed with the Court's rea-soning in the present case. In *IAM v. Winship Green Nursing Center,* 103 F.3d 196 (1st Cir.1996), Judge Saris, a district judge sitting by designation, addressed in her concurrence the issue of whether two pieces of campaign literature were "used in commerce" under facts analogous to the ones at bar. The case involved the attempt by the International Association of Machinists and Aerospace Workers Union ("IAM") to organize the non-professional employees at Winship Green Nursing Center. In response to this campaign, the company circulated two sets of flyers, consisting of several pages each. Each set included a page which was written on what appeared to be IAM letterhead, which itself bore the IAM service mark. *Id.* at 199. One of the flyers purported to be a letter from the union requesting that Winship terminate an employee due to his or her failure to pay union dues. The second was a simulated invoice from the union, listing a series of dues payable to it, as well as some other commentary. *Id.* Two of the judges from the panel determined that Winship's actions did not violate the Lanham Act, because they were not "likely to confuse." *Id.* at 207. Though she agreed with much of the majority's holding, Judge Saris also concluded that Winship's "use" of the IAM service mark was not prohibited by the Lanham Act. *See id.* at 209 (Saris, J., concurring). She first noted that "trial courts have rejected efforts to extend the Lanham Act to cases where the defendant is not using or displaying the trademark in the sale, distribution or advertising of its goods or services." *Id.* (citing *Lucasfilm Ltd. v. High Frontier,* 622 F.Supp. 931, 932 n. 2 (D.D.C. 1985); *Stop the Olympic Prison v. United States Olympic Comm.,* 489 F.Supp. 1112, 1124 (S.D.N.Y.1980); *Reddy Communications Inc. v. Environmental Action Found.,* 477 F.Supp. 936, 946 (D.D.C.1979); *L.L. Bean, Inc. v. Drake Publishers,* 811 F.2d 26, 32 (1st Cir.1987)). Judge Saris then determined that the use of mark in labor dispute was not a use in "commercial sale or advertising" because it was not directed at advertising or promoting the union itself. *Id.* at 210.[3]

---

**3.** The lower court in IAM had come to a similar conclusion. *See IAM v. Winship Green Nursing* *Center,* 914 F.Supp. 651, 655 & n. 7 (D.Me.1996).

As Judge Saris noted in *IAM*, there may be some instances in which a union's use of a company trademark may constitute "commercial sale or advertising" for purposes of the Act. *Id.* at 210. One of the cases cited by Judge Saris to illustrate an instance where liability may incur was *Brach Van Houten Holding, Inc. v. Save Brach's Coalition for Chicago*, 856 F.Supp. 472, 475–76 (N.D.Ill. 1994), a case also extensively cited by the Plaintiffs. In *Brach*, a non-profit organization (Save Brach's) whose purpose was to prevent the Brach company from closing a certain candy factory in Chicago adopted the Brach company logo as its own. *Id.* at 474–75. The Save Brach's coalition included a labor union, presumably the union organized for the candy factory workers. The Court concluded that Save Brach's provided a "service" for purposes of the Lanham Act because it was "engaged in soliciting donations, preparing press releases, holding public meetings and press conferences, propounding proposals for the reorganization of Brach's ownership and/or management, and other activities designed to bring about change in the Brach's organization and enhance the stability of workers' jobs." *Id.* at 475. Consequently, although this argument was not explicitly made by the *Save Brach's* court, Judge Saris noted that the organization's act of adopting the logo as its own was also a "use in commerce," because the logo was used in buttons and bumper stickers which were in turn used to publicize Save Brach's. *IAM*, 103 F.3d at 210.

In contrast, in the present case the Union's purpose in distributing the flyers bearing the Wildhorse Saloon restaurant was not to advertise itself or its services, but to pressure an employer in a labor dispute. Thus, the Union did not "use in commerce" the Wildhorse Saloon logo and could not be held liable under either §§ 43(a) or (c) of the Lanham Act.

## C. *Likelihood of Confusion*

The Sixth Circuit uses an eight-part test to determine whether the use of a trademark is "likely to cause confusion." The factors to be considered include:

1. strength of the senior mark;
2. relatedness of the goods or services;
3. similarity of the marks;
4. evidence of actual confusion;
5. marketing channels used;
6. likely degree of purchaser care;
7. the intent of the defendant in selecting the mark; and
8. likelihood of expansion of the product lines.

*Daddy's Junky Music v. Big Daddy's Family Music*, 109 F.3d 275, 280 (6th Cir.1997). Whether there is a likelihood of confusion is a mixed question of law and fact. *Champions Golf Club, Inc. v. The Champions Golf Club, Inc.*, 78 F.3d 1111, 1116 (6th Cir.1996). The Court must make factual findings with respect to the factors set forth above, but the final determination of whether a particular set of facts establish "likelihood of confusion" is a question of law. *Homeowners Group, Inc. v. Home Marketing Specialists, Inc.*, 931 F.2d 1100, 1107 (6th Cir.1991).

In applying the "likelihood of confusion" standard to this case, the Court will not discuss at length the individual factors highlighted by the Sixth Circuit because most are not helpful under the facts of this case, which is not a run-of-the-mill trademark action. *See Daddy's Junky Music*, 109 F.3d at 280 (likelihood of confusion factors are not to be applied mathematically). Rather, the Court will focus on the ultimate inquiry, or "whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way." *Id.* at 280 (quoting *Homeowners Group*, 931 F.2d at 1107).

Under the facts of the present case, the Court finds that as a matter of law, a typical consumer would not believe that the flyers are affiliated in any way with the Wildhorse Saloon, or that the Wildhorse Saloon sponsored the flyers. As described earlier in this opinion, the Union's version of the logo is a parody which is not flattering. Although the use of humor in advertising is common practice, the flyers at issue include a listing of health food violations by the Wildhorse Saloon restaurant, and the words "A Public Service." A typical consumer would not be-

lieve that this kind of flyer could have emanated from the Wildhorse Saloon restaurant. A reputation for cleanliness and hygiene is so integral to the business of a restaurant that no reasonable person would believe that one would purposefully distribute a flyer containing a listing of its health food violations—even as a part of a distasteful or unconventional advertising campaign. *Cf. IAM,* 103 F.3d at 206–207 (use of union's service mark by employer on leaflets distributed during labor campaign where employees had reason to view suspiciously each side's propaganda did not confuse as to source or sponsorship); *Senco Products, Inc. v. International Union of Elec. and Machine Workers,* 311 F.Supp. 590, 591 (S.D.Ohio 1970) (union's use of the company name on handbills distributed to employees during labor dispute would ' not cause a reasonable person to believe that the handbills were circulated under the sponsorship of the company). In fact, in their briefs in opposition to the Motion to Dismiss, the Defendants do not claim that the public might be led to believe that the flyers were sponsored by the Wildhorse Saloon, or that the Saloon's and the Union's goods or services were somehow affiliated. *See Daddy's Junky Music,* 109 F.3d at 280. Rather, they claim that the flyers gave potential customers the mistaken impression that the Wildhorse Saloon was itself involved in a labor dispute with the Union. (*See* Pls' Mem. in Opp. to Mot. to Dismiss at 8.) However damaging this kind of mistaken assumption by a customer may be to the Wildhorse Saloon, this is not the type of confusion that is actionable under the Lanham Act.

The Plaintiffs have directed the Court to the case of *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.,* 604 F.2d 200 (2d Cir.1979) to illustrate that while the Wildhorse Saloon and the Union are not competitors, the Union's use of its trademark still meets the "likelihood of confusion" standard. *Dallas Cowboys* involved a trademark infringement action brought by the Dallas Cowboys Cheerleaders against the makers of the pornographic film "Debbie Does Dallas." The film starred cheerleaders dressed in uniforms nearly identical to those worn by the Dallas Cowboys Cheerleaders. In addition, in advertising for the film, the plaintiff cinema referred to Debbie, the film's main character, as a "Dallas Cowgirl Cheerleader" and a "Dallas Cheerleader." *Id.* at 202–03. The court, responding to the defendants' claim that "the Lanham Act requires confusion as to the origin of the film, and ... that no reasonable person would believe that the film originated with the plaintiff," explained:

> Appellants read the confusion requirement too narrowly. In order to be confused, a consumer need not believe that the owner of the mark actually produced the item and placed it on the market [citations omitted]. The public's belief that the mark's owner sponsored or otherwise approved the use of the trademark satisfies the confusion requirement. In the instant case, the uniform depicted in "Debbie Does Dallas" *unquestionably brings to mind* the Dallas Cowboys Cheerleaders ... This association results in confusion which has a tendency to impugn [citations omitted] and injure plaintiff's business reputation ... [citations omitted].

*Id.* at 204–05 (emphasis added). The use of the term "unquestionably brings to mind" arguably implies a lower standard for establishing a "likelihood of confusion" than that adopted in the Sixth Circuit, which requires a showing that consumers believe that the products are actually "affiliated." *See Daddy's Junky Music,* 109 F.3d at 280; *see also* Robert J. Shaughnessy, Note, *Trademark Parody: A Fair Use and First Amendment Analysis,* 72 Va.L.Rev. 1079, 1095 (1986) ("A casual reference to a brand name certainly brings to mind the product the name represents, but such a reference creates a likelihood of confusion only if the audience engages in the unrealistic assumption that the name's owner sponsors or uses it."). The classic example of an instance where these two standards diverge is one party's use of another's trademark in a way that disparages the trademark to a degree that no reasonable consumer would believe that the trademark's owner approved or sponsored the use of the trademark. Although use of the trademark may unquestionably bring to mind another product, consumers would not reasonably believe that the products are affiliated. This is in fact what happened in the present case.

However, even if the *Dallas Cowboys* court did imply a less demanding "likelihood of confusion" standard, its reasoning was the product of conflating the requirement of confusion in trademark infringement cases under Section 43(a) of the Lanham Act, 15 U.S.C.A. § 1125(a), with the standard for trademark disparagement, Section 43(c) of the Lanham Act, 15 U.S.C.A. § 1125(c). Trademark disparagement, unlike infringement, does not require a showing of consumer confusion. It is directed at "protect[ing] famous trademarks from subsequent uses that blur the distinctiveness of the mark or tarnish or disparage it, even in the absence of likelihood of confusion." *American Express Co. v. CFK, Inc.*, 947 F.Supp. 310, 314 (E.D.Mich.1996) (quoting H.R.Rep. No. 374, 104th Cong., 1st Sess. 3 (1995), U.S.Code Cong. & Admin.News 1995, 1029, 1030). The *Dallas Cowboys* court incorporated the concern for protecting the reputation of a trademark into its determination of whether the actions of the plaintiff in the case before it were likely to confuse. *See Dallas Cowboys*, 604 F.2d at 205 ("The trademark laws are designed not only to prevent consumer confusion but also to protect 'the synonymous right of a trademark owner to control his product's reputation.' ") (quoting *James Burrough Ltd. v. Sign of the Beefeater, Inc.*, 540 F.2d 266, 274 (7th Cir.1976)). The court thus manipulated the confusion requirement to reach the outcome suggested by the dilution theory. *Shaughnessy*, 72 Va.L.Rev. at 1095.

Furthermore, the continued validity of the Dallas Cowboy holding is questionable. Several courts and academic articles have criticized this opinion. *See, e.g., L.L. Bean*, 811 F.2d at 29 (criticizing First Amendment analysis in the case); Dorsen, 65 B.U.L .Rev. at 951 (same); Robert C. Denicola, *Trademarks as Speech: Constitutional Implications of the Emerging Rationales for the Protection of Trade Symbols*, 1982 Wis.L.Rev. 158, 206 (1982) (same); *Shaughnessy*, 72 Va.L.Rev. at 1095–96 (criticizing "likelihood of confusion" analysis). Also significant is the fact that the Second Circuit itself in *Rogers v. Grimaldi*,

875 F.2d 994 (2d Cir.1989) has declined to extend part of the *Dallas Cowboys* holding. *Dallas Cowboys* had suggested that First Amendment rights were not violated by preventing a party from using another's trademark to convey a message if there were alternative avenues to do so. *Dallas Cowboys*, 604 F.2d at 206. In *Rogers*, however, the Second Circuit explained that alleged infringers need not always show that they have "alternative avenues of communication," and distinguished *Dallas Cowboys* as a case that involved "blatantly false advertising." *Rogers*, 875 F.2d at 998–99 n. 4. Thus, at least in this respect, the Second Circuit has expressed a willingness to limit the *Dallas Cowboys* holding. Because of the uncertain precedential value of the *Dallas Cowboys* holding, the Court will not adopt the somewhat altered standard for confusion expressed in that opinion.

In sum, the Court concludes that because the Plaintiffs cannot show that the Union used the trademark in commerce, or that there is any likelihood of confusion from the Union's use of the Wildhorse Saloon logo, no violation of the Lanham Act has been proven. All that remains are the Plaintiffs' state law claims, which include Tennessee statutory trademark, common law trademark, common law interference with economic advantage, and unfair competition.

### D. *First Amendment*

█ The Union has also asserted a First Amendment defense to the claims brought against it. However, the Court has refrained from delving into the First Amendment questions because it has determined that the Lanham Act, as a statutory matter, does not prohibit the Union's conduct. It is a well-established principle of judicial analysis that courts should attempt to avoid making a constitutional adjudication where a statutory one will suffice.[4] *See Hagans v. Lavine*, 415 U.S. 528, 549, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974); *Whalen v. United States*, 445 U.S.

---

4. The law in the Sixth Circuit is unclear as to whether the Union's conduct constituted "commercial speech," as well as to what degree commercial speech is protected from the reaches of

the Lanham Act. *See Semco, Inc. v. Amcast, Inc.*, 52 F.3d 108, 110–13 (6th Cir.1995) (declining from interpreting the meaning of "commercial" for purposes of the Lanham Act).

684, 702, 100 S.Ct. 1432, 63 L.Ed.2d 715 (1980) (Rehnquist, J., dissenting).

### E. State Law Claims–Supplemental Jurisdiction

Having disposed of the federal trademark claims, the Court must decide whether it will exercise its discretion to extend supplemental jurisdiction in order to rule on the state law claims presented. The Union has asked the Court to exercise its supplemental jurisdiction to hear the state law claims, asserting that if the Court dismisses these claims for lack of jurisdiction and the Plaintiffs re-assert these claims in state court, the Union will claim a First Amendment defense and remove the case again to federal court. Thus, the Union asserts that it would be in the interests of judicial economy for the Court to exercise its supplemental jurisdiction over these state claims.

■ A district court may in its discretion decline to exercise supplemental jurisdiction over pendent state law claims if the court has dismissed all federal claims. 28 U.S.C. § 1367(c). While retaining jurisdiction is sometimes appropriate, the preferred course of action is to decline to exercise pendent jurisdiction. *Williams v. City of River Rouge*, 909 F.2d 151, 157 (6th Cir.1990) (citing cases). Indeed, the Supreme Court has specifically noted that when an action's federal claims "have dropped out of the lawsuit in its early stages," then "the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state law claims." *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350 & n. 7, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988); *accord State v. 777 N. White Station Road, Memphis, Tenn.*, 937 F.Supp. 1296, 1304 (W.D.Tenn.1996) (citing cases). Keeping in mind the preference for dismissing state law claims, the Court will take up the considerations highlighted as relevant in *Carnegie–Mellon* in sequence.

■ With respect to the first factor, the Court initially notes that even if the Union asserted a First Amendment defense in state court, the federal system would nonetheless not have subject-matter jurisdiction to hear these claims. Thus it would not be possible for the Union to remove the action to federal court. Under the well-pleaded complaint rule, a court must look to the nature of the claims asserted by the plaintiff to determine whether a federal question exists, not to any possible defenses which could be asserted by the defendants. *Franchise Tax Bd. v. Const. Laborers Vacation Trust*, 463 U.S. 1, 9–10, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983); *Warner v. Ford Motor Company*, 46 F.3d 531, 534 (6th Cir.1995). In the present case, even if the Plaintiffs were to re-file their state law claims in state court, all of their claims would involve only state law questions, and the only federal issues would be asserted by way of defense. Thus, under the well-pleaded complaint rule, a federal court would not have subject-matter jurisdiction over these claims. Consequently, it would not be in the Court's interest to retain jurisdiction over this action for the mere sake of procedural simplicity.

Moreover, the interest in preserving judicial economy would not be furthered by the exercise of the Court's supplemental jurisdiction. Two considerations exist with regard to judicial economy: (1) the extent to which the federal court has expended time or resources on the state law claims, and (2) the degree to which a state court would be required to replicate the federal court's efforts. *777 N. White Station Road*, 937 F.Supp. at 1305. In the instant case, the Court has not expended any time considering the state law issues presented by the Plaintiffs, and thus there would be no waste of judicial resources if the state courts were to take up these claims.

Second, the parties have not alleged that they will be inconvenienced or prejudiced if the state law issues proceeded in state court. The state court building in Nashville is located near the federal one, and it appears from the allegations made in the Complaint that all relevant parties and witnesses reside in Tennessee. In addition, the parties have not alerted the Court to any statute of limitations problems that would occur if the state law claims are dismissed in the present action. *See id.* at 1304 (parties would not be inconvenienced litigating in state court because state court was located in same judicial district as

federal court, and there was no indication that it would be more difficult to subpoena witnesses in state court). It is also significant that the parties have not begun conducting discovery in this action, and thus no significant resources have been expended by the parties litigating the state law claims in the present action.

Furthermore, considerations of comity also favor dismissal of the state law claims. The concept of "comity" involves giving the proper respect for the respective functions and interests of the federal and state judicial systems. *See id.* at 1305 (citing *Pennzoil Co. v. Texaco, Inc.,* 481 U.S. 1, 10, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987)). To this end, federal courts must protect its interests "in ways that will not unduly interfere with the legitimate activity of the States." *Pennzoil,* 481 U.S. at 10. Furthermore, "[w]hen state law issues are complicated, or state law is unclear or in the process of evolving, comity considerations may weigh toward remand of the state law claims." *777 N. White Station Road,* 937 F.Supp. at 1306.

The Court's cursory research of state law trademark issues reveals that there is only a limited number of cases interpreting Tenn. Code Ann. 47–25–502, one of the state claims asserted by the Plaintiffs. Thus, it would be improper for the Court to ignore the Tennessee state courts' interest in deciding whether the facts of this case violate this section. The Court is particularly sensitive to this since the defendants have asserted a First Amendment defense with respect to this claim, and the state courts will thus be required to construe this statutory section to avoid, as much as possible, First Amendment problems. *See Rogers,* 875 F.2d at 998 ("Because overextension of Lanham Act restrictions in the area of titles might intrude on First Amendment values, [the Court] must construe the Act narrowly to avoid ... a conflict."); *Cliff's Notes v. Bantam Doubleday Dell Pub. Group,* 718 F.Supp. 1159, 1162 (S.D.N.Y.1989) (same). Although the remainder of the Plaintiff's state law claims are not in a similarly nascent stage of development, for the sake of consistency, all the state law claims should be considered together by the state court.

Finally, the fact that the Defendants intend to assert a First Amendment defense to the state law claims does not necessitate this Court's retention of these claims. Before the Court can decide whether the First Amendment bars the Plaintiffs' claims, the Court must first determine whether the Union's actions violated any state laws. Thus, state law interpretation is integral to the resolution of the Plaintiff's claims. Furthermore, it is likely that the state court will find that the Plaintiffs have failed to prove the required elements at least with respect to the claims of: trademark infringement under Tenn. Code Ann. 47–25–511, common law trademark infringement, unfair competition, and interference with economic advantage, and thus will not need to reach the First Amendment issue with respect to those claims. *See, e.g., Men of Measure Clothing v. Men of Measure,* 710 S.W.2d 43, 48 (Tenn.Ct.App. 1985) ("[t]here is nothing to suggest a divergence among federal law, Tennessee common law or general principles of trade-mark law"); *Sovereign Order of St. John v. Grady,* 119 F.3d 1236, 1243 (6th Cir.) (in order to prove tort of unfair competition, must show that the defendant " 'passed off' its organization or services as that of the plaintiff" with an intent to deceive), *cert. denied,* —— U.S. ——, 118 S.Ct. 1163, 140 L.Ed.2d 174 (1998); *Nelson v. Martin,* 958 S.W.2d 643, 1997 WL 726405, at *2–*3 (Tenn. Nov.24, 1997) (Tennessee law does not recognize tort of interference with economic advantage). Thus, the Court believes that the Tennessee state courts should be given a chance to rule on the applicability of state law to the Union's conduct. Even if resolution of the claims required the state court to take up the First Amendment issues, it is entirely competent to do so. *777 N. White Station Road,* 937 F.Supp. at 1307.

Accordingly, the Court will decline to exercise pendent jurisdiction over the state law claims, and dismisses them without prejudice.

## IV. CONCLUSION

Because the Plaintiffs have failed to prove that the Union "used in commerce" the Wildhorse Saloon name and logo, or that the Union's use of the mark is likely to confuse, the Court dismisses the Plaintiffs' federal trademark claims against the Union. Fur-

thermore, the Court declines to extend pendent jurisdiction to hear the Plaintiffs' remaining state law claims. Accordingly, the Court dismisses the Plaintiffs' federal claims with prejudice, and the Plaintiffs' state law claims without prejudice.

An appropriate Order will be issued forthwith.

### ORDER

Pending before the Court is the Defendant's Motion to Dismiss, (Doc. No. 7), to which the Plaintiffs have filed a Response (Doc. No. 11). The Defendant in turn has filed a Reply (Doc. No. 13). Because the Plaintiffs' have failed to prove that the Union "used in commerce" the Wildhorse Saloon name and logo, or that the Union's use of the mark is likely to confuse, the Court DISMISSES the Plaintiffs' federal trademark claims against the Union. Furthermore, the Court declines to extend supplemental jurisdiction to hear the Plaintiffs' remaining state law claims. Accordingly, the Court DISMISSES the Plaintiffs' federal claims with prejudice, and the Plaintiffs' state law claims without prejudice.

A Memorandum setting forth in more detail the Court's reasoning is entered contemporaneously.