Kelley v. SAU #54                    CV-98-439-M    07/22/99

UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Kate A. Kelley
and Richard J. Kelley,
      Plaintiffs

      v.                                    Civil No. 98-439-M

School Administrative Unit #54,
      Defendant

**O R D E R**

Kate Kelley brings this action against her former employer, School Administrative Unit #54, alleging that she was subjected to a hostile work environment which eventually forced her to resign from her teaching position in Rochester, New Hampshire. She seeks compensatory and punitive damages under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. Her husband, Richard, also seeks damages under New Hampshire's common law for loss of consortium.

Defendant asserts that Kelley failed to file a charge of discrimination with the New Hampshire Commission for Human Rights ("NHCHR") within 180 days of the last alleged violation and also failed to file a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") within 300 days of the alleged violation. Accordingly, defendant argues, because Kelley's claims were not filed with the EEOC in a timely fashion, she cannot pursue her Title VII claims in this court. As to the state common law claim filed by Kelley's husband, defendant

asserts that it is barred because the spouse of an alleged civil rights victim has no right to pursue an ancillary cause of action for loss of consortium.

Finally, defendant argues that even if Kelley may proceed with her Title VII claim, she is barred from seeking additional damages for injuries sustained as a result of a hostile work environment because a state jury already awarded her full and fair compensation for those injuries. On those grounds, defendant moves for summary judgment as to both counts of plaintiffs' complaint.

## Standard of Review

Summary judgment is appropriate when the record reveals "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). When ruling upon a party's motion for summary judgment, the court must "view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."

2

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). If the moving party carries its burden, the burden shifts to the nonmoving party to demonstrate, with regard to each issue on which it has the burden of proof, that a trier of fact could reasonably find in its favor. <u>See</u> <u>DeNovellis v. Shalala</u>, 124 F.3d 298, 306 (1st Cir. 1997).

At this stage, the nonmoving party "may not rest upon mere allegation or denials of [the movant's] pleading, but must set forth specific facts showing that there is a genuine issue" of material fact as to each issue upon which he or she would bear the ultimate burden of proof at trial. <u>Id.</u> (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986)). In this context, "a fact is 'material' if it potentially affects the outcome of the suit and a dispute over it is 'genuine' if the parties' positions on the issue are supported by conflicting evidence." <u>Intern'l Ass'n of Machinists and Aerospace Workers v. Winship Green Nursing Center</u>, 103 F.3d 196, 199-200 (1st Cir. 1996) (citations omitted).

## Factual Background

For purposes of its motions for summary judgment, defendant does not contest the factual allegations set forth in plaintiffs' complaint. Accordingly, at this juncture, the court will assume the truth of those allegations.

3

In September of 1993, Kelley began working for defendant as a teacher in the Rochester Middle School. Shortly thereafter, someone began defacing personal items in her office (such as photographs) and subjecting her to vulgar and sexually-oriented graffiti. Kelley says that she reported these incidents to the school's principal, who said that it was probably just a middle school student and that she should get used to such adolescent conduct. Despite her repeated reports of vandalism and harassment, the school conducted no investigation into Kelley's allegations. The perpetrator continued his obscene and vulgar conduct throughout the 1993-1994 and 1994-1995 school years, as a result of which Kelley suffered mental anguish and emotional distress.

In an effort to end the harassment Kelley switched jobs, assuming the duties of the school's librarian. That position included a private office, which could be locked when she was not present. Nevertheless, the perpetrator gained access to Kelley's office and the harassing, demeaning, and offensive conduct persisted. At that point, because students did not have access to her locked office, Kelley began to suspect that the harassment was being conducted by a fellow faculty member or other school employee. Kelley again reported the repeated acts of harassment to school officials, but no administrative investigation was undertaken, nor was any report filed with the local police.

4

At the beginning of the 1996-1997 academic year, the harassment resumed. In response to the perpetrator's continued defacing of her personal photographs, Kelley removed all such items from her desk. Nevertheless, the harassment continued, and the perpetrator began leaving clippings from newspapers and magazines of women who resembled Kelley. On them he wrote sexually charged and highly offensive comments.

Toward the end of the academic year, in March of 1997, Kelley again reported the perpetrator's actions, this time to Dr. Raymond Yeagley, Superintendent of the Rochester School District. She told Yeagley that although she had initially attributed the incidents to student "pranks," she was now concerned that the harassment may be coming from another employee of the school district. Yeagley told Kelley that her report would be fully investigated and suggested that they involve the Rochester Police Department. In his affidavit, Yeagley says that Kelley expressed uncertainty as to whether she wished to involve the police.

A few days later, however, Kelley contacted the Rochester Police Department on her own, and that department promptly began an investigation. As part of its investigation, and with Yeagley's cooperation, the police placed a video surveillance camera in Kelley's office. On April 4, 1997, Kelley came to work and noticed that a framed picture of her and her son had been defaced. She contacted the police, who retrieved the

5

surveillance video.  The video was clear — the school's custodian, Alphonse Boucher, entered Kelley's office, removed the picture from its frame, drew on Kelley's breasts with a pen, and returned the picture to her desk.

On April 8, 1997, police interviewed Boucher, following which they obtained a warrant for his arrest.  The next day, Yeagley suspended Boucher from his position as custodian, pending a termination hearing by the Rochester School District.  Under defendant's supervision, Boucher removed his personal belongings from the school and never returned.

In an affidavit submitted in connection with a related state civil action, Kelley testified that the harassment stopped after Boucher was removed from the school in April of 1997.  See Exhibit B to Defendant's motion for summary judgment (document no. 6), at para. 7.  Nevertheless, shortly after returning for the start of the 1997-1998 academic year, Kelley claimed that she could no longer work at the school because of all that she had endured, see id., and because in September of 1997 (more than five months after Boucher had been removed), she discovered "old writings in her desk which she had not previously seen." Complaint at para. 38.  Those "old writings" consisted of obscene drawings and lewd comments, which Kelley concedes were, in all likelihood, authored by Boucher and left in her desk at some point before he was discharged.  In October of 1997, Kelley

6

submitted her resignation, saying that she could no longer continue her employment at the school as a result of all that she had gone through.

Plaintiffs later filed suit in Strafford County (New Hampshire) Superior Court, alleging claims against both the Rochester School District and Boucher. The trial court dismissed the claims against the school district as barred by the state's workers' compensation law, but her claims against Boucher proceeded to trial. The jury returned verdicts against Boucher in favor of Kate Kelley and Richard Kelley (on his loss of consortium claim).

It does not appear that Kelley ever filed a charge of discrimination with the New Hampshire Commission for Human Rights, the state's fair employment agency. See 29 C.F.R. §§ 1601.74 & 1601.80; N.H. Rev. Stat. Ann. 354-A:3. However, on January 20, 1998, Kelley completed a "Charging Party Information" questionnaire, which she says was mailed to the EEOC on January 21, 1998 (the record suggests that the EEOC actually received that form on February 9, 1998, more than 300 days after the date on which Boucher was removed from the school and the harassment apparently ceased). It was not until February 24, 1998, that Kelley mailed a formal charge of discrimination to the EEOC. See Exhibit 2 to document no. 10, Letter dated June 1, 1998 to Kelley from Leonard Moore of the EEOC. That charge was apparently

7

received by the EEOC on February 27, 1998. As required by law, the EEOC notified defendant of Kelley's charge on March 3, 1998. See 42 U.S.C. 2000e-5(e)(1); 29 C.F.R. § 1601.14(a) (requiring the EEOC to notify the employer within ten days of the filing of a charge of discrimination).

## Discussion

Title VII obligates plaintiffs to exhaust administrative remedies before filing suit in federal court. See Lawton v. State Mutual Life Assurance Co. of America, 101 F.3d 218, 221 (1st Cir. 1996). The general rule provides that charges of discrimination must be filed with the EEOC within 180 days of the discriminatory act, unless the charge is first filed with an authorized state agency, in which case it must be filed with the EEOC within 300 days of the discriminatory act. See 42 U.S.C.A. § 2000e-5(e); E.E.O.C. v. Commercial Office Products Co., 486 U.S. 107, 110 (1988). Because Kelley did not file any charge of discrimination with the NHCHR, defendant asserts that she was required to file her charge with the EEOC within 180 days of the last act of alleged discrimination.

Title VII's statutory time limits may, however, be affected by the terms of work-sharing agreements between the EEOC and authorized state agencies in deferral states. See, e.g., Commercial Office Products, 486 U.S. at 122; E.E.O.C. v. Green, 76 F.3d 19, 23 (1st Cir. 1996); Russell v. Delco Remy Div. of

8

General Motors Corp., 51 F.3d 746, 750-51 (7th Cir. 1995). New Hampshire is a deferral state, which means that it has its own fair employment practices statute, New Hampshire Revised Statutes Annotated chapter 354-A, and its own enforcement agency, the NHCHR. See 42 U.S.C.A. § 2000e-5(c). And, in the past, the NHCHR has entered into yearly work-sharing agreements with the EEOC. See, e.g., Madison v. St. Joseph Hospital, 949 F.Supp. 953, 958 (D.N.H. 1996).

Unfortunately, the parties have not submitted a copy of the relevant EEOC-NHCHR work-sharing agreement for the pertinent year(s). Under the customary terms of past work-sharing agreements, the NHCHR and EEOC have agreed to serve as each other's agent for purposes of filing complaints and the NHCHR has waived its 60-day exclusive jurisdiction period under certain circumstances. Typically, the effect of the dual-filing rule and NHCHR's waiver of its exclusive jurisdictional period is to allow claimants the benefit of the full 300-day filing period. See generally Sweet v. Hadco Corp., No. 95-576-M, slip op. (D.N.H. February 3, 1997).

Nevertheless, defendant suggests that there is some question as to whether Kelley is entitled to the benefit of the 300-day limitations period or whether she should be held to a shorter limitations period. But, because defendant has failed to fully develop (or support) that argument, the court will assume that

9

the 300-day limitations period applies.  Even extending Kelley the benefit of a 300-day limitations period, however, the record reveals that she did not file a charge of discrimination with the EEOC in a timely manner.

I.    Calculating the Filing Deadline.

Defendant suspended Boucher, pending a termination hearing, on April 9, 1997.  Under defendant's supervision, he collected his personal belongings from the school and never returned.  Thus, defendant contends that all of the discriminatory acts directed at Kelley ended, at the very latest, on that date (Kelley agrees that Boucher was the sole source of the sexual harassment directed at her and concedes that the harassment ended once he was caught and removed from the school).  Accordingly, defendant suggests that Kelley had until February 3, 1998 (i.e., 300 days after April 9, 1997) to file her complaint with the EEOC, which she failed to do.

Kelly, on the other hand, argues that her claim under Title VII did not "accrue" until her "constructive discharge" in October of 1997, when she resigned her teaching position due to psychological and physical conditions relating to the harassment she had suffered.  Alternatively, she suggests that the harassment to which she was subjected was "continuing" and did not end with Boucher's termination in April, 1997.  Rather, she says that notwithstanding Boucher's absence from the school, she

10

continued to suffer the effects of his harassment into the Fall of 1997, when she discovered Boucher's "old writings" in her desk. Thus, she claims that the 300-day limitations period did not begin to run until October of 1997 (when she resigned) or, at the earliest, September of 1997 (when she discovered the last of Boucher's harassing notes). The court disagrees.

First, it is important to note that Kelley's Title VII claim is one by which she seeks compensation for a hostile work environment. She has not advanced a claim for constructive discharge. See generally Complaint, Count I. Thus, the date of her alleged "constructive discharge" is not independently relevant in calculating when the applicable limitations period began to run. Instead, the court must focus on the last date on which Kelley claims to have been the victim of sexual harassment. And, as noted above, that date appears to have been, at the very latest, April 9, 1997.

Even if Kelley's complaint could arguably be construed to allege a claim for constructive discharge, she would not fair any better. The court of appeals for this circuit has consistently held that a claim for constructive discharge can only survive upon proof that the conditions under which plaintiff worked were "so arduous or unappealing, or [her] working conditions so intolerable that a reasonable person would feel compelled to forsake [her] job rather than to submit to looming indignities."

11

Vega v. Kodak Caribbean, Ltd., 3 F.3d 467, 480 (1st Cir. 1993).

See also Ramos v. Davis & Geck, Inc., 167 F.3d 727, 732 (1st Cir. 1999) ("We have long applied an 'objective standard' in determining whether an employer's actions have forced an employee to resign. The test is whether a reasonable person in the employee's shoes would have felt compelled to resign.") (citations and internal quotation marks omitted). Here, Kelley has pointed to no evidence in the record from which a rational trier of fact could reasonably conclude that, when she resigned in October of 1997, defendant had made the conditions under which she was working so intolerable that her decision to resign (to the extent it was based upon the conditions of her employment) was reasonable. See generally Tavares de Almeida v. Children's Museum, 28 F.Supp.2d 682, 686-87 (D. Ma. 1998). Nor has she demonstrated that the defendant employer could have reasonably foreseen that, despite its legitimate effort to stop the harassment, she would discover, nearly six months after Boucher's suspension, the offensive writings which had been in her desk since at least the prior Spring. Stated somewhat differently, Kelley does not allege that there were any additional steps that defendant could have or reasonably should have undertaken to prevent her from discovering Boucher's "earlier writings."

Finally, to avoid summary judgment with regard to a claim for constructive discharge, Kelley would have to demonstrate that her alleged constructive discharge occurred "within a reasonable

12

time after last being the subject of discrimination." Smith v. Bath Iron Works Corp., 943 F.2d 164, 167 (1st Cir. 1991). In Smith, the court of appeals concluded that a delay of roughly six months between the date on which plaintiff was last subjected to harassment and her subsequent resignation precluded any claim for constructive discharge. Id. Accord Jett v. Dallas Indep. Sch. Dist., 798 F.2d 748, 755-56 (5th Cir. 1986) (no constructive discharge when plaintiff resigned five months after working in allegedly intolerable conditions), modified on other grounds, 491 U.S. 701 (1989); Hirschfeld v. New Mexico Corrections Dept., 916 F.2d 572, 580 (10th Cir. 1990) (affirming district court's rejection of constructive discharge claim where plaintiff did not leave job until four months after alleged acts of discrimination).

Kelley has failed to demonstrate that a rational trier of fact could reasonably conclude that: (a) the conditions of her employment prior to her resignation in the Fall of 1997 were so intolerable that her decision to resign was reasonable; (b) defendant could or should have taken any further remedial steps which might have prevented her from discovering Boucher's "old writing;" or (c) her decision to resign as a teacher at Rochester Middle School was made within a reasonable period of the date on which she was last subjected to harassment. Thus, even if her complaint alleged a claim for constructive discharge, defendant would be entitled to judgment as a matter of law.

13

That Kelley discovered offensive and lewd writings authored by Boucher prior to his departure (more than five months earlier), does not amount to a new, discrete act of discrimination or harassment. Instead, as Kelley seems to recognize and concede in her complaint, the discovery of those writings no doubt aggravated the injury and suffering she experienced at Boucher's hands, but was not contemporaneous harassment. See Complaint, para. 38 ("These symptoms were further aggravated when the plaintiff Kate A. Kelley found old writings inside her desk which she had not previously seen."). Consequently, the date in October of 1997 when Kelley resigned is not the point at which to start the running of the 300-day limitations period; her earlier (and continuing) distress was no doubt revisited when she discovered that artifact of Boucher's earlier harassment, but one can hardly say that defendant was aware of or permitted an act of harassment in October, having resolved the problem back in April.

Boucher's sexual harassment of Kelley ended, at the very latest, on April 9, 1997, when defendant properly and permanently removed him from his position at the school. Notwithstanding her subsequent discovery of Boucher's "old writings," the actionable conduct for which defendant might be held liable ceased when it took both reasonable and effective steps to stop the harassment by investigating Kelley's complaints, cooperating with law enforcement officers to discover the identity of the perpetrator,

14

and then terminating Boucher's employment.  Thus, in order for her to have filed a timely charge with the EEOC, Kelley must have filed her charge of discrimination on or before February 3, 1998 (i.e., within 300 days of April 9, 1997).[1]

II.  <u>Charge of Discrimination v. Intake Questionnaire</u>.

To support her claim that she filed her charge with the EEOC on or before February 3, 1998, Kelley says that she filed a "Charging Party Information" intake questionnaire (which was signed under oath) on January 21, 1998.  While technically not a "charge of discrimination" (as must be filed within the 300-day limitations period), Kelley says that filing the intake questionnaire within the limitations period should be sufficient and, in support of that thesis, she relies on <u>Philbin v. General Electric Capital Auto Lease, Inc.</u>, 929 F.2d 321 (7th Cir. 1991).  In <u>Philbin</u>, the Court of Appeals for the Seventh Circuit held that a verified intake questionnaire may, under certain circumstances, constitute a "charge."  And, while it does not appear that the court of appeals for this circuit has yet addressed the issue, a number of other courts have held that a

---

[1]  The EEOC also concluded that the limitations period began to run in April of 1997, when Boucher was suspended.  <u>See</u> Exhibit 2 to defendant's response to plaintiffs' objection (document no. 10), Letter dated June 1, 1998 from EEOC to Kelley ("On April 8, 1997, the harasser was arrested and suspended.  He never returned after April [9], 1997.  The harassment did not continue after that date.  You filed your charge . . . more than 300 days after April 1997. . . [Y]our charge is untimely.").  Of course, experienced labor and employment attorneys, if not plaintiff herself, are well aware of the applicable limitations period.

15

verified intake questionnaire may constitute a valid "charge." See generally Shempert v. Harwick Chemical Corp., 151 F.3d 793, 196 n.7 (8th Cir. 1998) (collecting cases), cert. denied, 119 S.Ct. 1028 (1999).

So, again giving Kelley the benefit of the doubt, the court will deem her intake questionnaire to have been a "charge" that defendant engaged in discriminatory employment practices, as that term of art is used in the applicable statute and regulations. That, however, does not resolve the question concerning whether Kelley complied with the pertinent regulations by filing the intake questionnaire, or charge, in a timely fashion.

Title VII provides that charges "shall be in writing under oath or affirmation and shall contain such information and be in such form as the [EEOC] requires." 42 U.S.C. § 2000e-5(b). The applicable regulations make clear that a charge of sexual discrimination is timely if received by the EEOC within the pertinent limitations period. See 29 C.F.R. § 1601.13. Thus, as this court (Devine, J.) has previously held, a charge which is mailed within the limitations period but not received by the EEOC until after that period has lapsed is untimely. See Madison v. St. Joseph Hospital, 949 F.Supp. at 960 ("Title VII provides that charges 'shall be filed in writing under oath or affirmation and shall contain such information and be in such form as the [EEOC] requires.' The timeliness of the filing is determined by the

16

date on which the charge is <u>received</u> by that agency.") (emphasis in original) (citations omitted).  <u>See also</u>, <u>Taylor v. General Telephone Co. of the Southwest</u>, 759 F.2d 437, 440 (5th Cir. 1985) ("Our review of case construing Title VII filing provisions leads inescapably to the conclusion that 'mailing' may not be construed as 'filing' for the purposes of Title VII."); <u>E.E.O.C. v. Dillard Dept. Stores</u>, 768 F.Supp. 1247, 1252 n.2 (W.D. Tenn. 1991) ("The plaintiff's argument that [the] charge should be considered received when mailed is without merit."); <u>Johnson v. Host Enterprise, Inc.</u>, 470 F.Supp. 381, 383 (E.D. Pa. 1979) ("Charges of employment discrimination may, of course, be filed with the EEOC by mail.  The timeliness of filings, however, is determined by the date on which the charge is <u>received</u> by the EEOC.") (emphasis added) (citations omitted).

The rule advocated by Kelley, under which a complaint would be deemed timely if <u>mailed</u> to the EEOC within the pertinent limitations period lacks support in the unambiguous text of the regulations, as well as the case law applying those regulations. Thus, the court concludes that in order to be timely, a charge must be <u>received</u> by the EEOC within the pertinent limitations period.

The pertinent dates in this case are as follows: (1) on January 20, 1998, Kelley completed the charging party information questionnaire; (2) on January 21, 1998, she says that it was

17

mailed to the EEOC; and (3) the EEOC received and date-stamped that form on February 9, 1998. Importantly, Kelley has pointed to no evidence in the record which suggests that the EEOC might have received her questionnaire at any point prior to that date (e.g., received the form prior to February 3, but failed to date stamp it until nearly a week later). It is, therefore, plain that Kelley's "charge" was not filed in a timely fashion (i.e., on or before February 3, 1998).

**Conclusion**

A federal court may not adjudicate a Title VII claim unless a timely charge of discrimination has been filed with the EEOC. See 42 U.S.C. § 2000e-5(e)(1). Even allowing Kelley the benefit of treating her verified intake questionnaire as a formal "charge" and assuming that she is entitled to the benefit of the 300-day limitations period, the record demonstrates that she still failed to file that document with the EEOC in a timely fashion. And, she has not demonstrated that there is any equitable basis upon which to toll that limitations period.

In sum, the last date on which Kelley could have been subjected to actionable workplace harassment, for which her employer might be held liable, was April 9, 1997. The 300-day limitations period lapsed on February 3, 1998. Kelley did not file her "charge" (intake questionnaire) with the EEOC until a week later, on February 9, 1998. While the court is sympathetic

18

to plaintiff's situation and all she endured at Boucher's hands, much of which could probably have been avoided if defendant had undertaken investigative action earlier when she first complained, Kelley simply did not file her charge with the EEOC within the time allowed by law.  Consequently, defendant's motion for summary judgment (document no. 6) as to count 1 of plaintiffs' complaint (sexual harassment) must be and is granted.  As to count 2 of the complaint (state common law claim for loss of consortium), the court declines to exercise its supplemental jurisdiction.  See generally Camelio v. American Federation, 137 F.3d 666 (1st Cir. 1998).  Defendant's motion for summary judgment on count 2 (document no. 13) is, therefore, denied as moot.

The Clerk of the Court shall enter judgment in accordance with the terms of this order and close the case.

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

July 22, 1999

cc:  Robert A. Shaines, Esq.
     Donald E. Gardner, Esq.