Dartmouth v. U.S. Life Insurance      CV-99-588-M    09/19/01
                    UNITED STATES DISTRICT COURT

                      DISTRICT OF NEW HAMPSHIRE


Dartmouth Hitchcock Clinic, and
Hitchcock Clinic, Inc.,
      Plaintiffs

      v.                                    Civil No. 99-588-M
                                            Opinion No. 2001 DNH 169
United States Life Insurance
Company in the City of New York,
      Defendant


                            **O R D E R**


      This dispute concerns an insurer's right to cancel a group

insurance policy.  Plaintiffs, Dartmouth-Hitchcock Clinic and

Hitchcock Clinic, Inc., are "participating employers" in an

insurance trust, through which they extend insurance benefits to

their employees under a group accident and health insurance

policy - policy no. G-128,105 (the "policy"), issued by the

defendant, United States Life Insurance Company in the City of

New York ("U.S. Life").[1]  Before the court are the parties'

cross-motions for summary judgment.


**Background**

I.    <u>General</u>.

      The University Physicians Trust (the "Trust") was created on

July 1, 1981, by James M. Andrew d/b/a Medical Group Financial

Services, for the purpose of holding insurance policies in trust

for the benefit of employees (and their spouses and issue) of

participating employers.  The Trust agreement was amended and

restated in 1994, identifying Medical Group Financial Services,

Inc. ("MGFS") as both settlor and trust administrator, and

Citizens Trust Company (a Rhode Island banking corporation) as

trustee.  The policy was issued on July 1, 1990, naming the

Trustee as the policyholder.  See Policy at FP.  Portions of the

---

[1]      Both parties attached copies of the policy to their
respective motions.  See Defendant's motion for summary judgment,
Ex. B; Plaintiffs' objection and cross-motion for summary
judgment, Ex. 1.  For purposes of this order, references to the
policy will cite its alpha-numerical page numbers (which
correspond to specific sections of the policy).

2

policy were amended on October 1, 1993, and again on September 1, 1995. See Plaintiffs' objection and cross-motion, Ex. 1.

Under the terms of the Trust and the policy, "participating employers" are employers who enter into an agreement with the settlor to participate in the Trust, thereby entitling them to apply for insurance provided under the policy. See Defendant's motion for summary judgment, Ex. A, University Physicians Trust ("Trust Agreement"); Policy at DEF-2, PE-1. The term "insured or insured persons" refers to employees insured under the policy. See Policy at DEF-2.

The policy describes all benefits and options available under it, and sets out general provisions, exclusions, and means by which insurance coverage may be terminated. Each participating employer's rights under the policy are further defined in a discrete plan of insurance ("plan"). The plan, in conjunction with the policy, identifies the benefits and options elected by that employer and made available to its employees.

The premium charged each participating employer differs depending on coverage elections made and is set out in the respective plans. See Policy at PLAH-1. "[U.S.] Life may change premium rates for a Participating Employer: . . . when [the] policy is amended; . . . when an affiliate is added to or deleted from [the] policy; . . . [or] on the day following the Rate Guarantee specified in the Participating Employer's plan of insurance." Id. Several participating employers maintain plans under the policy.

To summarize, then, a single, overriding policy of insurance provides general terms, limitations, and provisions concerning the scope, duration, and cancellation of insurance benefits. Each participating employer's contractual rights are further defined in a unique "plan," tailored specifically to that employer's needs. The question central to this litigation is whether an amendment to an employer's discrete plan necessarily amends the terms of the overriding policy.

4

II.  The Policy.

Insurance extended under the policy may terminate in several ways, most of which are not pertinent to this case.  For purposes of this litigation, it is sufficient to note that the policy expressly reserves U.S. Life's "right to end [the] policy on any policy anniversary after the first," with sixty days advance written notice to the policyholder.  Policy at PE-1.  The policy anniversary date is July 1.

The policy's "General Provisions" govern changes to the policy and unequivocally require that any changes be approved in writing by an officer of U.S. Life, "endorsed on or attached to [the] policy."  See Policy at GP-1.  The policy also expressly limits an agent's authority to modify the policy, stating that "[n]o agent may change or waive any provision of this policy. Any change or waiver must be approved in writing by an officer of United States Life."  See id.

5

III. Amendment of Plaintiffs' Plan.

Throughout their participation in the Trust, plaintiffs had no direct contact with U.S. Life. MGFS acted as a broker, working with plaintiffs and other participating employers to develop discrete plans of insurance under the policy, tailored to each employer's needs. In December of 1997, MGFS offered plaintiffs a new premium rate "guaranteed for three years" (the "rate guarantee"). Plaintiffs accepted the rate change on December 19, 1997, executing a "Request for Change in Plan," which references the policy number and provides:

> Effective January 1, 1998, the rate is renewed to $1.03 per $100 of monthly indemnity guaranteed for three years.

> Premium Rate Guarantee Date Expires on: December 31, 2000.

Plaintiffs' objection and cross-motion, Ex. 2.[2] Plaintiffs did not solicit the rate guarantee, and apparently no policy-related

---

[2] The quoted rate was guaranteed to The Hitchcock Clinic, Inc. Dartmouth-Hitchcock Clinic received a guaranteed rate of $1.04 per $100 of monthly indemnity.

discussion occurred.  MGFS sent U.S. Life a fax on August 24, 1998, summarizing the renewal terms for several participating employers, including plaintiffs' rate guarantee.  The communication between MGFS and U.S. Life made no reference to the specific terms of the policy.

On December 21, 1998, U.S. Life notified MGFS by letter that the policy would be cancelled on the next anniversary date (July 1, 1999).  The letter outlined how coverage issues would be handled until the effective date of termination, and U.S. Life informed MGFS that it was attempting to find a replacement carrier to continue providing coverage.

Over the next several months, U.S. Life attempted to negotiate a reinsurance agreement with Trustmark Insurance Company ("Trustmark"), an Illinois company.  Although not clearly developed in the record, it appears that the potential agreement with Trustmark either was not finalized, or was cancelled.  In any event, counsel for MGFS was notified in writing on October 1,

1999, that the policy termination date would be "extended one final time to December 31, 1999." <u>See</u> Complaint, Ex. L.[3] The letter instructed MGFS to inform all participating groups of the cancellation by November 1, 1999. Plaintiffs were first notified of the December 31, 1999, termination date by letter from U.S. Life (not MGFS) on November 24, 1999. The day after plaintiffs filed this suit, however, U.S. Life again extended the termination date to July 1, 2000 (the next anniversary date).

## Standard of Review

When ruling upon a party's motion for summary judgment, the court must "view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." <u>Griggs-Ryan v. Smith</u>, 904 F.2d 112, 115 (1st Cir. 1990). Summary judgment is appropriate

---

[3] The October 1, 1999, letter is written on American General Assurance Company ("American General") stationery. American General acquired U.S. Life in 1997. Plaintiffs' complaint acknowledges that the letters on American General stationery are, for the purposes of this case, attributable to U.S. Life.

8

when the record reveals "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In this context, "a fact is 'material' if it potentially affects the outcome of the suit and a dispute over it is 'genuine' if the parties' positions on the issue are supported by conflicting evidence." Intern'l Ass'n of Machinists and Aerospace Workers v. Winship Green Nursing Center, 103 F.3d 196, 199-200 (1st Cir. 1996) (citations omitted).

## Discussion

U.S. Life moves for summary judgment on grounds that the policy unambiguously reserves to it the right to cancel the policy on any anniversary date after the first and, therefore, as a matter of law, it had the right to cancel the policy on July 1, 2000, notwithstanding rate guarantees extended to participating employers in individual plans. Plaintiffs counter that by extending a three year rate guarantee under their plan, MGFS, acting as U.S. Life's agent, necessarily modified the policy's cancellation terms, thereby precluding U.S. Life from cancelling

9

the policy during the period covered by the rate guarantee.
Plaintiffs also assert that a genuine dispute exists regarding
MGFS's agency authority – actual, apparent, and/or implied - to
amend the terms of the policy.  Accordingly, they seek additional
time to respond to defendant's motion, in order to obtain
previously requested (but undisclosed) discovery concerning the
scope of MGFS's authority and U.S. Life's own understanding of
the meaning of the term "rate guarantee."  See Fed. R. Civ. P.
56(f).  Plaintiffs also move for summary judgment, claiming that
the "Request for Change in Plan" that was executed to formalize
the rate guarantee, when read in conjunction with the policy,
unambiguously modified the policy's cancellation provisions.

As an initial matter, plaintiffs' Rule 56(f) request is
denied.  It is within the court's discretion to grant such a
motion if:

> [the] party who seeks to invoke the rule . . . (i)
> make[s] an authoritative and timely proffer; (ii)
> show[s] good cause for failure to have discovered . . .
> essential facts sooner; (iii) present[s] a plausible
> basis for the party's belief that facts exist that

10

> would likely suffice to raise a genuine and material
> issue; and (iv) show[s] that the facts are discoverable
> within a reasonable amount of time.

Morrissey v. Boston Five Cents Sav. Bank, 54 F.3d 27, 35 (1st

Cir. 1995).  Here, as discussed below, plaintiffs have not shown

that the desired information is likely to establish a material

factual dispute.  Accordingly, the court turns to a consideration

of the merits of the parties' motions.


Both parties agree that, as provided in the policy, Rhode

Island law governs their dispute and, under Rhode Island law,

insurance policies are subject to general rules of contract

construction.  See, e.g., Aetna Cas. & Sur. Co. v. Sullivan, 633

A.2d 684, 686 (R.I. 1993).  The policy must be read as a whole to

determine if its terms are ambiguous.  See id. (noting that words

and phrases cannot be viewed in isolation or out of context when

determining whether ambiguity exists).  Absent ambiguity, the

court will give effect to the language of the policy as written.

See Employers Mut. Cas. Co. v. Pires, 723 A.2d 295, 298 (R.I.

1999) (per curiam); Aetna Cas. & Sur. Co., 633 A.2d at 686.  But,

11

"[i]f an ambiguity exists, the court will consider the construction placed upon terms by the parties. The circumstances surrounding the execution of the contract are relevant to the determination of the parties' intent." Johnson v. Western Nat'l Life Ins. Co., 641 A.2d 47, 48 (R.I. 1994) (per curiam) (citation omitted). The court will not, however, read ambiguity into an otherwise unambiguous contract. See Aetna Cas. & Sur. Co., 633 A.2d at 686.

I.   A Rate Guarantee Does Not Implicitly Amend the Policy
     Cancellation Provisions as a Matter of Law.

The cornerstone of plaintiffs' argument is their contention that "[l]egally an insure[r][4] cannot cancel the underlying insurance coverage during the effective period of a rate guarantee." Plaintiffs objection and counter motion at 14. On that basis, plaintiffs argue that an inherent ambiguity arises when policy documents include both a rate guarantee and a broad,

_____

[4]     Plaintiffs' memorandum actually reads "an insured cannot cancel . . . during . . . a rate guarantee." Plaintiffs' objection and counter motion at 14 (emphasis added). Given the context, clerical error is assumed.

12

discretionary cancellation provision.  See id. at 16-17.  See also Plaintiffs' reply to defendant's objection (document no. 26) at 9.  The court disagrees.

Plaintiffs' argument rests upon an interpretation of precedent that is, at best, stretched.  None of the decisions upon which they rely stands for the proposition that a rate guarantee necessarily guarantees insurance coverage for a period co-extensive with the term of the rate guarantee, or otherwise operates, as a matter of law, to limit the terms of an express cancellation provision.  And, in this case, it is clear from the material submitted by the parties that they plainly anticipated, in some cases, that rate guarantees might be extended to individual employers under their individual plans.  Nothing suggests, however, that such rate guarantees would in any way affect or alter the policy's termination provisions.  Nor does anything submitted suggest that the particular rate guarantee extended in this case superceded or eliminated those termination provisions.

13

The policy unambiguously anticipates both the possibility that rate guarantees might be extended under various participating employers' plans and that U.S. Life might, nevertheless, cancel the policy on any anniversary date after the first, with the agreed-upon advance notice. In other words, because it contains both provisions concerning U.S. Life's authority to cancel the policy and a limitation on its right to change policy premiums during a rate guarantee period, the policy plainly contemplates the co-existence of rate guarantees and U.S. Life's right to cancel in accordance with the termination provisions. See Policy at PLAH. Nothing in the record suggests plaintiffs negotiated for, or thought they obtained, or could have reasonably thought they obtained non-cancellable insurance when their plan was amended to provide for a fixed-period rate guarantee. Nor is there any evidence that U.S. Life either attempted to exact a higher premium rate during a rate guarantee period, or exercised its discretion under the cancellation provision as a means by which to circumvent the rate guarantee and extort a higher premium (i.e., by threatening cancellation if

14

plaintiffs did not acquiesce to a higher premium rate) - facts that might give rise to a claim that U.S. Life breached an implied covenant of good faith and fair dealing.

In isolation, the term "rate guarantee" might be deemed ambiguous, in the sense that one might argue that its impact on termination is "unclear." But, when the term is read in the context of the entire policy, see Aetna Cas. & Sur. Co., 633 A.2d at 686, there is nothing ambiguous about it. In context, the only thing guaranteed was a premium rate identified in a particular plan of insurance related to a particular participating employer. The plans, however, are not the policy. The policy is issued to the Trustee, is common to all participating employers, and delineates the blanket rights and duties of everyone involved – U.S. Life, the Trustee/policyholder, the participating employers, and the insured employees. Plans, on the other hand, are tailored for each participating employer, within the framework of the policy itself and, while they supplement and further define rights and

15

obligations, the terms of the plans do not necessarily alter the terms of the policy. So, in the context of this policy, as issued, recognizing U.S. Life's right to unilaterally cancel the policy on any policy anniversary date is not inconsistent with it ability to guarantee rates to discrete participating employers, whose plans remain subject to the policy's terms. The rates remain guaranteed for the period specified, so long as the policy is in effect, but subject, of course, to U.S. Life's right to cancel (in good faith).

II. No Evidence That The Parties' Specifically Intended to Modify the Policy Cancellation Provisions.

Under Rhode Island law, "modification to an enforceable contract requires that the parties assent to the essential terms of their obligations and that an agreement embrace these terms." Fondedile, S.A. v. C.E. Maguire, Inc., 610 A.2d 87, 92 (R.I. 1992). "The modification can be written, oral, or implied, but the burden of proving the existence of the modification rests with the party alleging the new contract." Id. (citation omitted). Accordingly, in this case the burden of proving that

16

the rate guarantee operated to modify the policy's cancellation provisions is on plaintiffs.

Whether a modification occurred is usually a question of fact.  See 2 Lee R. Russ & Thomas F. Segalla, Couch on Ins. § 25:27 (3d ed. Supp. 2000).  But, if there is no genuine issue of material fact, the issue can be decided at the summary judgment stage.  See id.

U.S. Life concedes that MGFS was authorized to extend rate guarantees to participating employers, as contemplated by the policy.  Plaintiffs, however, argue that a genuine dispute exists concerning MGFS's authority to modify the policy, and they contend withheld documents would reveal U.S. Life's own understanding of the meaning of "rate guarantees" (presumably, an understanding that, notwithstanding the formalities required for modification of the policy's express cancellation provision, a rate guarantee nullified both the modification and cancellation

17

provisions sub silentio).  Because the contract is unambiguous, however, the documents plaintiffs seek are not pertinent.

Construction of an unambiguous contract is limited to the four corners of the policy.  See, e.g., Aetna Cas. & Sur. Co., 633 A.2d at 686 ("The necessary prerequisite to this court's departure from the literal language of the policy is a finding that the policy is ambiguous.").  Moreover, any dispute about MGFS's authority to modify the policy is not material here because plaintiffs have not met their burden of presenting evidence tending to show a modification to the policy occurred at all.

To demonstrate the existence of a modification, plaintiffs "must show that the parties demonstrated both subjective and objective intent to be bound by the new contract's terms." Fondedile, S.A., 610 A.2d at 92.  Plaintiffs agree that the pertinent Requests for Change in Plan incorporate the terms and conditions of the policy.  See Defendant's motion for summary

18

judgment, Deposition of David Brooker ("Brooker Depo.") at 55. Therefore, each Request for Change in Plan must be read consistently with the policy's terms. See 17A Am. Jur. 2d Contracts § 400 (Cum. Supp. 2001) ("Where a written contract refers to another instrument and makes the terms and conditions of such other instrument a part of it, the two will be construed together as the agreement of the parties.").

The record demonstrates that plaintiffs did not read the policy before signing the Requests for Change in Plan, see Brooker Depo. at 72, and, therefore, had no specific understanding of the term "rate guarantee" as it might relate to the policy's cancellation provisions. Indeed, plaintiffs were apparently unaware that U.S. Life had reserved the right to cancel the policy, notwithstanding the possible extension of rate guarantees. Nonetheless, plaintiffs are charged with knowledge of the terms of the policy. See 2 Couch on Ins. §§ 21:16, 31:113. The policy fully contemplates the extension of discrete guaranteed rates in each participating employer's plan, but does

19

not purport to thereby waive or modify the terms related to cancellation. The summary judgment record does not support plaintiffs' claim that the parties necessarily intended to negate the policy's cancellation provision during any period covered by a rate guarantee offered under an employer's unique plan.

Significantly, plaintiffs do not assert that they either expected or requested that the policy's cancellation provisions be modified or eliminated. Nor do they say they intended to obtain non-cancellable insurance by obtaining a guaranteed rate. They have pointed to no evidence that MGFS suggested that the policy's cancellation provisions would be affected by a rate guarantee, or that insurance coverage provided under the rate guarantee would be non-cancellable.[5] Plaintiffs' only support for their contention that the rate guarantee necessarily superceded or modified the policy's cancellation provisions is

---

[5]     Plaintiffs also seek discovery related to assurances of coverage allegedly made to MGFS. Plaintiffs' need for that discovery, however, demonstrates that they were not given such assurances by MGFS, and, therefore, did not rely on them.

the claim that they "assumed" a rate guarantee to be the equivalent of a coverage guarantee for the applicable rate period.  Read in light of the entire policy, however, such an assumption was not reasonable.  A rate guarantee standing alone, under this policy, simply imposed upon the insurer the option to provide insurance at the agreed-upon rate for the agreed-upon period, or cancel the policy at the next anniversary date, with the requisite advance notice.

Furthermore, the language used in the Requests for Change in Plan, and past course of dealing among the parties, support the entry of summary judgment in defendant's favor.  The forms signed by plaintiffs' representative were clearly labeled "Requests for Change in Plan."  Approved changes to the policy, however, were clearly labeled "Policy Amendment."  <u>See</u> Plaintiffs' objection and counter motion, Ex. 1 (complete copy of policy including five amendments).  And, in contrast to the Requests for Change in Plan, the Policy Amendments preserve all <u>policy</u> provisions not addressed by the amendment.  Moreover, in accordance with the

21

express language of the policy, Policy Amendments were necessarily signed by the chairman of the board of U.S. Life and attached to the policy.  Requests for Change in Plan were simply executed by the plaintiffs' representative, and were not "endorsed on or attached to [the] policy."  See Policy at GP-1 (stating how changes can be made).  In short, it is evident from their dealings that the parties fully understood that more than a change in plan was necessary to effect a change in the policy. Cf. Fondedile, S.A., 610 A.2d at 92 ("Both the express provisions of the contract and the parties' prior practice show that in modifying the original contract, defendants manifested objective intent through a written change order.").

To the extent plaintiffs thought otherwise, they were mistaken and that mistake was unilateral in character.  Because no evidence suggests defendant was aware of plaintiffs' unilateral mistake, U.S. Life retained its right to cancel the policy on any anniversary date after the first, even though it agreed to a three year rate guarantee.  Cf. Hashway v. Ciba-Geigy

Corp., 755 F.2d 209, 211 (1st Cir. 1985) ("A mistake by one party with knowledge thereof by the other is equivalent to a mutual mistake; a party should not be benefitted by a mistake he knew the other had made."). Again, that is not to say that U.S. Life retained the ability to cancel the policy for an improper purpose (e.g., to extract premiums higher than those guaranteed).

## Conclusion

Group policy G-128,105, issued to the Trustee of the University Physician's Trust, unambiguously reserves to defendant U.S. Life the right to cancel the policy, in good faith, on any anniversary date, notwithstanding the extension of rate guarantees to plaintiffs under plan documents. U.S. Life thus acted within its contractual rights, as a matter of law, when it cancelled the policy, with appropriate advance notice, on July 1, 2000. Accordingly, defendant's motion for summary judgment (document no. 14) is granted, and plaintiffs' motion for summary judgment (document no. 18) is denied. The Clerk of Court shall

23

enter judgment in accordance with the terms of this order and close the case.

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

September 19, 2001

cc:  Ronald L. Snow, Esq.
     Robert R. Lucic, Esq.
     Irwin B. Schwartz, Esq.